IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 15, 2007

**STATE OF TENNESSEE v. JAMES WILLIAM GANN, JR.**

**Appeal from the Circuit Court for Coffee County**
**No. 31,723     L. Craig Johnson, Judge**

---

**No. M2006-01230-CCA-R3-CD - Filed October 16, 2007**

---

The defendant, James William Gann, Jr., was convicted of first degree premeditated murder, arson, and setting fire to personal property. *See* T.C.A. §§ 39-13-202(a)(1), -14-301(a)(1), -14-303(a) (1997). He received a sentence of life with the possibility of parole for the premeditated murder conviction. The trial court imposed a sentence of six years for the arson conviction and two years for the setting fire to personal property conviction to be served consecutively to each other and to the murder conviction for an effective sentence of life plus eight years. In this appeal, the defendant asserts (1) that the evidence is insufficient to support his convictions, (2) that the trial court erred in the admission of certain evidence, (3) that the State engaged in prosecutorial misconduct, and (4) that his sentence is excessive. Upon our review of the record, there is no reversible error and the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J, delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ. joined.

B. Campbell Smoot, District Public Defender, and Margaret C. Lamb, Assistant District Public Defender, for the appellant, James William Gann, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; C. Michael Layne, District Attorney General; and Kenneth J. Shelton, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On December 6, 2000, firefighters responding to a fire at the residence of the victim, Willard Morris, Jr., discovered the victim's body under a pile of blankets. The victim had been stabbed repeatedly, and his clothing had been stuffed with wrapping paper, newspaper, and receipts. The defendant, who was originally charged with first degree felony murder, first degree premeditated

murder, especially aggravated robbery, and two counts of arson, was convicted of first degree premeditated murder, arson, and setting fire to personal property.

The victim's mother, Linda Morris, testified that she last saw the victim alive on the evening of December 5, 2000. She and her husband visited briefly with the victim, who showed them a large amount of cash totaling at least $1,100, and left at approximately 9:30 p.m. According to Ms. Morris, the victim kept money in an encyclopedia and under a loose piece of carpeting in his house, but when she searched the house after the fire, she did not find any money in either location.

Tullahoma Fire Department Firefighter Jason Morgan responded to the fire at the victim's residence and used a digital thermal imaging camera to search for signs of life inside the structure and found none. According to Mr. Morgan, the house was a "complete wreck" with objects torn from the wall and thrown onto the floor, the shower curtain torn down, and furniture overturned. He found a large pile of quilts in the front room of the house. After the fire was under control, Mr. Morgan began a search for bodies and saw the victim's fingers protruding from the edge of the pile of blankets in the den. Mr. Morgan pulled back the blankets and saw that the victim's shirt was soaked with blood and that his clothing had been stuffed with paper. Officials from the State Fire Marshall's Office concluded that the fire began in the kitchen, where numerous items of clothing, some still on hangers, had been placed on top of the stove and inside the oven.

Tullahoma Police Department Investigator Jason Ferrell led the investigation into the victim's death and seized a poster board and two pieces of toilet paper that contained blood drops and smears as well as a tuft of "light blondish-brown hair" that was in the victim's hand. As he was collecting evidence from the scene, Ferrell received a telephone call from Timmy Brawley, who stated that he had important information regarding the victim's death. Ferrell met with Brawley, and Brawley agreed to wear a wire and meet the defendant at his residence. Ferrell recalled that he listened to the conversation but admitted that parts of it were distorted. Ferrell specifically recalled that the defendant told Brawley that his wife had scratched his cheek and poked him in the eye. At some point, the defendant got into a vehicle with Brawley, and the police stopped the vehicle. The defendant agreed to come to the police station for questioning and traveled there in Brawley's car. Ferrell stated that he continued to listen to the conversation between the defendant and Brawley. According to Ferrell, the defendant told Brawley, "We are the only alibi that each other's got." Brawley responded, "I'm telling the truth."

At the police station, the defendant waived his rights in writing and provided a statement in which he admitted smoking crack cocaine with the victim and Brawley at the victim's residence. He stated that he left the victim's residence at approximately 4:30 a.m. The defendant also told Ferrell that his blood would not be found at the victim's residence. The defendant said nothing about an altercation with the victim or about the presence of others who might have attacked the victim. He stated that after leaving the victim's residence he walked to a cab stand, but when he could not get a cab, he walked to the Favorite Market and called a cab. The cab picked him up and drove him home. The defendant claimed that he received the scratches on his hands while he was running from police on a prior occasion. After the defendant gave his statement, Ferrell transported

him to the hospital where blood was drawn for deoxyribonucleic acid ("DNA") testing. Ferrell explained that, because of the delay in receiving test results from the Tennessee Bureau of Investigation ("TBI"), the defendant was not arrested until he was indicted in January 2002.

Timmy Brawley, who had known the defendant for four or five years at the time of the victim's death, testified that on December 5, 2000, he and the defendant drove to two different locations in an unsuccessful attempt to purchase marijuana before driving to the victim's house to purchase cocaine. Brawley and the defendant purchased cocaine and left the victim's house at approximately 4:00 p.m. They then went to Brawley's house and injected the cocaine before traveling to Nashville in search of more drugs. While in Nashville, the two men purchased Dilauded and cocaine which they dissolved in water and injected before returning to Brawley's residence. There, they injected more cocaine and then traveled to the victim's residence. The defendant told Brawley to park next door and wait outside. Brawley waited thirty to forty-five minutes and then went to the front door. At that point, the defendant came to the door, told Brawley that the victim had agreed to "front him an eightball of cocaine," and instructed Brawley to go purchase cigarettes for the victim. When Brawley returned, the victim and defendant were cooking crack cocaine in the kitchen of the victim's residence. Thereafter, the three men "smoked a lot of cocaine." According to Brawley, the victim and the defendant argued about money, with the victim refusing to front any cocaine to the defendant. The victim did, however, offer to allow them to smoke all of the crack cocaine that he had in the house.

Brawley recalled that when he left the victim's residence at 3:45 a.m., the victim and the defendant were in the kitchen with a large amount of cocaine. At that time, the defendant was wearing baggy pants, a t-shirt, tennis shoes, and a blue flannel jacket that he had borrowed from Brawley on the previous day. Brawley returned to his residence, showered, drove his wife to work, and then drove his children to school. As he was driving to work later in the morning, he saw police at the victim's residence and observed that the house was on fire. Thereafter, he contacted Ferrell, who asked him to wear a wire and go to the defendant's house to retrieve the blue flannel jacket. Brawley admitted that he did not contact Ferrell until after he learned that the victim was dead. Brawley claimed that the defendant asked him to tell police that he had left the victim's residence with Brawley.

Seventeen-year-old Michael Kyle McKay, who lived across the street from the victim, testified that at approximately 7:45 a.m. on December 6, 2000, he saw a man carrying a garbage bag leave the victim's house and walk down the street. The man looked over his shoulder at the victim's house several times but did not appear to be in a hurry. He was approximately five feet, four inches tall and, because of his slim build and shoulder-length hair, McKay initially believed he was a woman. McKay recalled that the man was wearing navy blue or faded black sweat pants, a red and black checked shirt, and a navy blue toboggan. Upon viewing a photographic lineup, McKay identified the defendant as the man he had seen leaving the victim's house.

Doctor Feng Li, who performed the autopsy, testified that the victim had a of total 77 stab wounds in addition to a number of blunt force trauma injuries. The victim had 15 stab

wounds to the head and neck, 16 to the left side of the chest, four to the right chest, six to the abdomen, one to the right shoulder, one to the left thigh, and 34 to the back. At least one of the stab wounds penetrated the victim's heart and seven penetrated the lungs. Doctor Li testified that many of the wounds were likely inflicted after the victim lost consciousness and some after he had died. The cause of death was multiple stab wounds. Wounds to the victim's hands and arms were classified as defensive wounds. The victim's urine tested positive for cocaine and marijuana.

Scott Robinson, a driver for Courtesy Cab, testified that he picked the defendant up at Scot Market at 8:31 a.m. on December 6, 2000. He recalled that the defendant had long hair and acted completely normal.

Kristen Brazier, the defendant's girlfriend and mother of his three children, testified that the defendant left their residence on the evening of December 5, 2000, and returned at approximately 8:00 a.m. the following morning. Ms. Brazier, who was declared a hostile witness, admitted giving a statement to police that the defendant "had gashes on his hands, his thumb cut, and had a gash on his head. His scalp was busted." She also told police that the defendant claimed that he received the injuries in a fight in Nashville. The defendant did not appear upset or distraught when he discussed his injuries. On cross-examination, Ms. Brazier stated that the defendant had the cut on his head before he left on December 5. She claimed that she gave her statement to police only because she felt pressured by police.

Special Agent Joseph P. Minor of the TBI performed DNA testing on the items collected from the scene. According to Agent Minor, the defendant's blood was found on a piece of poster board found underneath the victim's body and a calendar found in the front room of the victim's house. Blood on a piece of toilet paper was a mixture from the defendant and the victim.

The defendant, who was 19 years old at the time of the crimes, testified that he was a heavy drug user during that time and that the victim was his usual supplier of cocaine. He stated that on December 5, 2000, he left his residence with Brawley in search of drugs. After unsuccessful attempts to purchase marijuana and cocaine elsewhere, he and Brawley bought cocaine from the victim. They injected the drugs at Brawley's house and then traveled to Nashville, where they purchased Dilaudid using clothing that Brawley had shoplifted. While in Nashville, the defendant injected both cocaine and Dilaudid. The two men then went to Brawley's house, where they injected more drugs before traveling to the victim's house to purchase more cocaine. While at the victim's residence, the defendant and Brawley smoked crack cocaine and agreed to split the purchase of an eightball. The victim sent Brawley for cigarettes, and he was gone thirty to forty-five minutes. The defendant contended that after he heard a car pull into the driveway, he went into the bathroom and vomited. He claimed that as he was cleaning himself up, he heard the sounds of a struggle coming from the front room of the house. When he came out of the bathroom, he saw Brawley and the victim fighting and observed Brawley "sticking" the victim. The defendant claimed that he was knocked unconscious when he tried to intervene in the melee.

When he regained consciousness, the defendant was lying on the floor and paper had been stuffed into his clothing. The defendant stated that he got up, pulled the paper out of his clothing, and "hit the door wide open." Although he saw the victim lying on the floor and saw and smelled smoke, he did not check to see if the victim was alive and did not attempt to offer any assistance. The defendant stated that he did not provide this information to police because he was sick and sleepy from ingesting Dilauded just prior to the interview. When asked why he did not get stabbed, the defendant stated that he heard someone say, "Just let him burn."

During cross-examination, the defendant said that he ran from the victim's house to Scot Market and stated that he did not call the fire department or the police because he felt as though he was "running for [his] life." The defendant could not explain how his blood came to be on the items seized from the victim's residence or how he had received the numerous scratches to his face and hands. He admitted lying to police about the origin of his injuries, explaining that he was scared.

Tammy Smith, a third-shift clerk at Scot Market, recalled that around 4:30 a.m., a white man with "scraggly hair," dark pants, a white t-shirt, and a blue checked shirt entered the store and told her he was waiting for a ride home to Shelbyville. The man, who she said "could have been" the defendant, was wearing work boots and had no injuries on his hands or face. Another clerk, Katie Ferrell, disagreed with Smith's description of the man from Shelbyville and described him as tall with broad shoulders and shoulder length dark hair.

At the conclusion of the trial, the jury returned verdicts of guilty for first degree premeditated murder, arson, and setting fire to personal property. The jury acquitted the defendant of especially aggravated robbery and felony murder.

*I. Sufficiency of the Evidence*

As his first issue, the defendant asserts that the evidence is insufficient to support his convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

A.  Premeditated Murder

Tennessee Code Annotated section 39-13-202(a)(1) provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another."  T.C.A. § 39-13-202(a)(1) (1997). "'[P]remeditation' is an act done after the exercise of reflection and judgment."  *Id.* § 39-13-202(d).

Proof of premeditation is inherently circumstantial.  The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime.  *See State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* §7.7 (2nd ed. 1986)).  Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing.  *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001).  Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing."  *Bland*, 958 S.W.2d at 660.

In this case, the proof established that the victim was last seen alive in the company of the defendant.  Both were under the influence of drugs, and the two men had argued over money during the evening.  The defendant's blood was found on a poster board underneath the victim's lifeless body, on two pieces of toilet paper near the body, and on a calendar only a few feet away. The defendant was seen leaving the victim's house on the morning of December 6 just before firefighters arrived on the scene.  The victim was stabbed 77 times, and his clothing was stuffed with paper.  The defendant started a fire in the house in an attempt to conceal the murder.  Many of the wounds were inflicted after the victim lost consciousness, and some were inflicted after the victim had died.  There was no evidence that the victim was armed, and wounds to his hands and forearms were classified by Doctor Li as defensive wounds.  McKay testified that the defendant did not appear to be in a hurry as he left the victim's house, and he was walking rather than running down the street. The defendant called a taxi to take him home, and the driver described the defendant's mood as completely normal.  The defendant's girlfriend also described the defendant as calm following the murder.  Under these circumstances, it is our view that the evidence was sufficient to support the conviction for premeditated first degree murder.

B.  Arson

"A person commits [arson] who knowingly damages any structure by means of a fire . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein . . . ."  T.C.A. § 39-14-301 (1997).  "A person commits arson who knowingly damages any personal property, . . . by means of a fire . . . [w]ithout the consent of all persons who have a possessory or proprietary interest therein; or . . . [w]ith intent to destroy or damage any such property for any unlawful purpose."  *Id.* § 39-14-303.

Here, the evidence, in the light most favorable to the State, established that the defendant ignited a fire at the victim's house using the stove and oven as the heat source and the victim's clothing, towels, and various other items as fuel. The victim's mother, who owned the house, testified that she did not give the defendant permission to set fire to the house. The evidence also established that the defendant set the fire for the purpose of concealing the true nature of the victim's death. The victim's clothing had been stuffed with paper, ostensibly to expedite the burning of the body. In our view, the evidence was sufficient to support the convictions of arson.

## II. Evidentiary Issues

### A. Photographs

The defendant contends that the trial court erred by admitting into evidence two photographs taken of his shoes on December 6, 2000. The photographs depict reddish-brown stains on the shoes. The inference suggested by the State, of course, was that the stains were blood. The defendant asserts that because no tests were conducted to confirm that the stains were indeed blood, any probative value they might have was outweighed by the danger for unfair prejudice.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id*. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

In this case, the State introduced into evidence two photographs taken of the defendant's shoes during his December 6 interview with Investigator Jason Ferrell. Although the photographs depict a number of reddish-brown stains on the shoes, Ferrell admitted that no testing was performed on the shoes and that he could not say that the stains were blood. In consequence, the photographs were not particularly probative. Nor were they, however, unfairly prejudicial, particularly when considered in light of the other evidence at trial. Thus, it is our view that the trial court did not abuse its discretion by admitting the photographs.

B. Testimony of Investigator Jason Ferrell

The defendant asserts that the State violated the rules of discovery by failing to turn over an audible tape recording of the December 6 conversation between the defendant and Brawley and that, inconsequence, the trial court should not have permitted Ferrell to relay portions of that conversation during his testimony. The State submits that there was no discovery violation and that the remedy fashioned by the trial court alleviated the effects of any error.

At trial, the defense objected to the testimony on the basis that the tape they had received from the State was inaudible and that they had not been provided with a transcript of the conversation. The prosecutor stated that he was unaware that the defense was unable to listen to the tape, that no transcript had been prepared, and that Ferrell was merely referring to the notes he had prepared after listening to the tape. The defense agreed that Ferrell could testify as to what he heard while monitoring the conversation but contended that he should not be allowed to reference either the tape or his notes. The trial court ruled that the notes could be used to refresh his recollection and that they would have to be provided to the defense prior to cross-examination. The State agreed to allow defense counsel access to equipment to listen to the tape. Ferrell testified that he monitored the conversation between the defendant and Brawley and that, although the sound was somewhat distorted, he was able to hear the bulk of the conversation. He went on to relay the content of the conversation.

Rule 16 of the Tennessee Rules of Criminal Procedure provides, in pertinent part, as follows:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

Tenn. R. Crim. P. 16(d)(2). Whether a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy. *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). Exclusion of evidence is a "drastic remedy and should not be implemented unless there is no other reasonable alternative." *Id*. at 270.

In this instance, the record does not support the defendant's claim. Although the defendant contends that the State violated the rules of discovery by providing defense counsel with an inaudible tape, the prosecutor stated, and defense counsel agreed, that the State had not been made aware of any problem with the tape prior to trial. There was no proof that the State had intentionally provided a faulty tape. In addition, the record establishes that no transcript of the tape was prepared

-8-

and thus none was disclosed. The trial court provided defense counsel with an opportunity to listen to the tape and examine Ferrell's notes prior to cross-examination. This was an appropriate remedy under the circumstances.

### III. Prosecutorial Misconduct

The defendant next contends that the State engaged in prosecutorial misconduct by suggesting, during Ferrell's direct examination, that the defendant vomited during his interview with Ferrell because he was guilty and by making improper and inflammatory statements during closing argument. The State claims that the defendant waived these issues.

### A. Direct Examination of Jason Ferrell

During Ferrell's direct examination, the prosecutor prefaced a question regarding the defendant's statement to police with the words, "And according to his statement that he made less than 24 hours after he killed Willard Morris . . . ." Defense counsel objected and the trial court sustained the objection. No curative instruction was requested. Later, when discussing the fact that the defendant vomited during the interview, the prosecutor stated, "It's just as likely he got sick because he knew why he was there as it was the use of drugs." Again, defense counsel objected and again, the objection was sustained. The defendant did not request a curative instruction.

Although the defendant complains that the trial court erred by failing to issue a curative instruction, the record establishes that none was requested. Because the defendant failed to seek a curative instruction, he has waived our consideration of the issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Jones*, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987) (holding that "failure to request [a] curative instruction[]" is failure to take action "reasonably available to prevent or nullify the harmful effect of an error").

### B. Closing Argument

The defendant asserts that the prosecutor made numerous improper and inflammatory statements during closing argument and that, as a result, he is entitled to a new trial. Initially, the State correctly points out that the defendant did not object during the prosecutor's closing argument. As indicated, appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987).

"[W]hether properly assigned or not," however, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. *State v. Ogle*, 666

S.W.2d 58, 60 (Tenn. 1984). Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). The word "plain" is synonymous with "clear" or equivalently "obvious." *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993). "Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id*. at 732 (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court adopted the standard announced by this court in *Adkisson*. There, we defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature." *Adkisson*, 899 S.W.2d at 639. Our supreme court also adopted *Adkisson*'s five factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. The supreme court also observed that "the 'plain error must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (internal quotation marks omitted).

Our Supreme Court, addressing the virtually identical Federal Rule of Criminal Procedure 52, has observed that "[t]he Rule . . . reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed." *United States v. Frady*, 456 U.S. 152, 163, 102 S. Ct. 1584, 1592 (1982). The Court also noted "that the power granted [to appellate courts] by Rule 52(b) is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Id.* at 163 n.14. Finally, the Court has held that "the burden of establishing entitlement to relief for plain error is on the defendant claiming it." *United States v. Dominguez Benitez*, 542 U.S. 74, 82, 124 S. Ct. 2333, 2340 (2004).

As indicated, the defendant complains about the propriety of the prosecutor's closing argument. Trial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper argument. *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978). Generally speaking, closing argument "must be temperate, must be predicated on evidence introduced during the trial of

the case, and must be pertinent to the issues being tried." *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict. *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). In *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court articulated the factors to be considered in making that determination:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
> (2) [t]he curative measures undertaken by the court and the prosecution[;]
> (3) [t]he intent of the prosecutor in making the improper statements[;]
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]
> (5) [t]he relative strength or weakness of the case.

*Id.* at 344.

Most restrictions during final argument are placed upon the State, based in great measure upon the role of the prosecutor in the criminal justice system:

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. . . .

*Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935); *see also Judge*, 539 S.W.2d at 344-45. Thus, the State must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial. The prosecutor must not express a personal belief or opinion, but whether that qualifies as misconduct often depends upon the specific

-11-

terminology used. For example, argument predicated by the words "I think" or "I submit" does not necessarily indicate an expression of personal opinion. *United States v. Stulga*, 584 F.2d 142, 147 (6th Cir. 1978). The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial. *See Dupree v. State*, 410 S.W.2d 890, 892 (Tenn. 1967); *Moore v. State*, 17 S.W. 30, 35 (Tenn. 1929); *Watkins v. State*, 203 S.W. 344, 346 (Tenn. 1918); *McCracken v. State*, 489 S.W.2d 48, 50 (Tenn. Crim. App. 1972). Although there may be no commentary on the consequences of an acquittal, the prosecution may point out the gravity of a particular crime and emphasize the importance of law enforcement. *See State v. Dakin*, 614 S.W.2d 812, 815 (Tenn. Crim. App. 1980); *Bowling v. State*, 458 S.W.2d 639, 641 (Tenn. Crim. App. 1970).

This court has observed that there are five generally recognized areas of prosecutorial misconduct related to closing argument:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

In this case, the prosecutor essentially began his closing argument on a sour note by comparing the defendant to a member of the "Manson family" and insisting that the crime he had committed was more heinous than theirs. The prosecutor made numerous, improper references to what he termed the defendant's "homicidal rage." In addition, he made the following highly inappropriate comments about the defendant:

[H]ere is a man that should never, ever be permitted to walk among free people again. . . .

. . . . He has forfeited his right to live as a human being because he chooses to live as an animal – to engage in savage animalistic conduct.

. . . . This is not the defendant that did what he did on December the 6th. He bears no resemblance to him. He is the defense's washed up and sanitized version of the truth, of the existence of Jay Gann.

Jay Gann is a homicidal maniac killer . . . .

. . . . He has forfeited everything that is human. He exists sitting here, but he is not human. He breathes air. He breathes air to which he is not entitled, but we as a society permit it. He takes up space on this planet, but provides nothing of tangible benefit.

This man is not subject to rehabilitation. Anyone who in an infantile homicidal rage stabs someone 77 times is not subject and should not be permitted to ever walk the streets with free people again – never, ever . . . .

The prosecutor also addressed the defendant personally:

. . . . [N]ot only are you a murderer, you are a brazen liar . . . . You are a killer without remorse, and you have no shame. A good father, a good citizen, a good man, a decent person, doesn't go into a homicidal rage like a kid who has been told, "No, you can't have candy today."

. . . . Your entire existence is a lie.

. . . . You used to be a nuisance. Now you are a threat. . . . You blow my mind. You sit there like a kid that I would have coached in baseball years ago, but you are a raging homicidal killer.

. . . . You lied. . . . [D]on't shake your head to me. I won't play your game. I won't condescend to sink to your level.

. . . . The lies that you have told are shameful, and you are shameless.

-13-

In addition to these comments, the prosecutor made the following remarks about the veracity of the defendant's testimony and the strategy of the defense:

> While [in New York with my daughter] I took her to see a play. What a waste of money. I should have brought her to work with me this week. This man's performance on the witness stand standing alone . . . justifies his conviction for murder in the first degree.
>
> . . . . [T]o believe his testimony, ladies and gentlemen, to believe anything that he told you from this witness stand is to allow yourself to engage in an academic exercise to go into a realm of reality where the Easter bunny is real and the tooth fairy is alive and well.
>
> At no time did this defendant while he was on the witness stand utter what could be considered a coherent thought, a thought with any basis in reality. What he testified to is an existence, a state of being that exists only in his homicidal mind – his sick homicidal mind.
>
> . . . . There is absolutely nothing in their defense but his fairy tale . . . . [O]nce they decide they are going to put on a defense, they owe it to you to put on a defense instead of a fairy tale.

Finally, the prosecutor made the following statement, "[T]his man has to be removed from society. You owe it to yourself, your family, your children, your grandchildren, your neighbor, everybody else you know, and those unknown to you. You owe them that responsibility. He should never see the light of day again."

The prosecutor made only passing references to the evidence presented and focused nearly the entirety of his argument on the defendant's character, the brutal nature of the crime, and the strategy of the defense. The statements referenced above were improper, inflammatory, and utterly indefensible as they violate nearly every rule established for proper closing argument. Further, our research reveals that this prosecutor, who is guilty of making similar statements in previous cases, has been previously admonished by our supreme court and this court to temper his closing arguments. *See State v. Bates*, 804 S.W.3d 868, 881 (Tenn. 2001); *see also State v. Taniese Annette Wilson*, No. 01C01-9802-CC-00083, slip op. at 6 (Tenn. Crim. App., Nashville, May 14, 1999); *State v. Ricky J. Sanders*, No. 89-187-III (Tenn. Crim. App., Nashville, Feb. 16, 1990); *State v. William Marvin Swoape*, No Number in Original (Tenn. Crim. App., Nashville, Jan. 10, 1985). Given his familiarity with this issue, we have no choice but conclude that the comments were intentional. The comments fall so far outside the realm of reasonable, permissible closing argument that it is difficult for this court to fathom defense counsel's failure to object. Clearly, had defense counsel lodged a contemporaneous objection, this court would reverse the convictions and remand

-14-

the case for a new trial. Because the issue is presented to us for plain error review, however, the question presented is much closer.

Initially, two of the five *Adkisson* factors are easily met. The record clearly establishes what occurred in the trial court and a clear and unequivocal rule of law was breached. As to the remaining factors, the defendant has failed to establish that the issue was not waived for tactical reasons. *See State v. Bledsoe*, 226 S.W.3d 349, 357-58 (Tenn. 2006). First, we are troubled by the defendant's concession in his brief that the failure to object "could be considered a tactical decision." Second, the prosecutor's comments were so improper that it is our view that no reasonable attorney would have failed to object out of simple inadvertence or neglect. Finally, it is difficult to know, upon a cold reading of the record, what effect the prosecutor's comments had on the jury. It is certainly possible that the argument was so outrageous that the prosecutor lost more credibility than he gained. If that were the case, then the failure to object could have been a reasonable tactical decision.

We are also not convinced that a substantial right of the accused was *adversely* affected or that consideration of the issue is necessary to do substantial justice in this case. Generally, "relief for error is tied in some way to prejudicial effect, and the standard phrased as 'error that affects substantial rights,' used in Rule 52, has previously been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding." *Dominguez Benitez*, 542 U.S. at 81. An error "may be so plain as to be reviewable . . . , yet the error may be harmless and therefore not justify a reversal." *United States v. Lopez*, 575 F.2d 681, 685 (9th Cir. 1978); *see Adkisson*, 899 S.W.2d at 642. The evidence of the defendant's guilt was more than sufficient. Further, that the defendant was acquitted of felony murder and especially aggravated robbery suggests that the jury was able to carefully consider the charges against the defendant and render its verdict based upon the evidence presented. Moreover, the trial court instructed the jury that the arguments of counsel are not evidence, and the jury is presumed to follow the instructions of the trial court. *See State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). Under these circumstances, it is our view that the prosecutor's remarks, although completely improper, had no effect on the verdict. *See* Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

*IV. Sentencing*

As his final complaint, the defendant challenges the length of his sentences as well as the imposition of consecutive sentencing. When a defendant challenges the lenght of a sentence, this court generally conducts a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2003). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id*. If the review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In

the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination in the present case, the trial court, at the conclusion of the sentencing hearing, was obliged to determine the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the guilty plea and sentencing hearings, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant made in his behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b); -103(5); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

## A.  Length of Sentences

In arriving at the defendant's sentences of six years and two years, the maximum within the range for each offense, the trial court found that the defendant "treated or allowed the victim to be treated with exceptional cruelty during the commission of the offenses," that "the personal injuries . . . inflicted and the amount of damage to the property that was sustained was particularly great," and that the defendant had "juvenile convictions that if they were adjudicated as an adult would have been felonies." *See* T.C.A. § 40-35-114(6), (7), (21).  The court found no mitigating factors.

The defendant concedes, and we agree, that the trial court's sentencing decision is entitled to a presumption of correctness.  Nevertheless, he argues that because the victim's house was not a total loss, the trial court erred by concluding that the damage to personal property was great. In our view, the record supports the conclusions of the trial court.  The evidence established that the defendant set fire to the victim's house and personal belongings in an effort to conceal the victim's murder.  The kitchen area of the house, as well as many of the victim's personal belongings, were destroyed by the fire.  The remainder of the house and the victim's belongings were damaged by smoke and water.

## B.  Consecutive Sentencing

When a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood; (2) The defendant is an offender whose record of criminal activity is extensive; (3) The defendant is a dangerous mentally

-16-

abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences; (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims; (6) The defendant is sentenced for an offense committed while on probation; or (7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (2006). The existence of a single category is sufficient to warrant the imposition of consecutive sentences, *see State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997), and indeed, "[e]xtensive criminal history alone will support consecutive sentencing," *id*. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used; the court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id.* at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

In assessing consecutive sentences, the trial court concluded "based upon [his] adult record and lengthy juvenile record that [the defendant is] a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood," that the defendant is "an offender whose record of criminal activity is extensive," and that the defendant is "a [d]angerous [o]ffender whose behavior evidences little or no regard for human life and [who has] no hesitation about committing a crime when the risk to human life is high." The court also found that "an extended sentence is necessary to protect the public against [the defendant's] future criminal conduct," and that "consecutive sentences relate to the severity of the offenses committed in this case."

The defendant contends this last finding was in error. It is our view, however, that the record supports the imposition of consecutive sentences. The defendant, only 19 at the time of the crimes, had more than 15 prior convictions, many of which were juvenile convictions that would have been classified as felonies if committed by an adult. His criminal history began at age 14, and

the presentence report established that the defendant's work history was nearly non-existent. Although the defendant claimed to have had four different jobs, he could not remember employment dates or his salary, and none of the employment could be verified. The defendant's lengthy criminal history and lack of a work record suggest that criminal activity was his primary source of livelihood. Further, the circumstances of the crimes indicate the defendant's willingness to commit a crime when the risk to human life was high. The crimes in this case were severe and, in our view, warranted the imposition of consecutive sentencing.

## CONCLUSION

In our view, the evidence was sufficient to support the defendant's convictions. Further, the trial court did not err by admitting into evidence photographs of the defendant's shoes or by permitting Jason Ferrell to testify as to a conversation between the defendant and Timmy Brawley. It is also our view that although the prosecutor made several improper and inflammatory comments during his closing argument, the error did not affect the outcome of the trial and could not, therefore, be classified as plain. Finally, it is our view that the sentence is not excessive. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-18-