IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 13, 2011 Session

## JAMES W. GANN, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Coffee County
No. 36,573    L. Craig Johnson, Judge**

---

**No.  M2010-01944-CCA-R3-PC - Filed July 13, 2012**

---

The petitioner, James W. Gann, Jr., was convicted of first degree murder, arson, and setting fire to personal property, and he received an effective sentence of life imprisonment plus eight years.  Subsequently, the petitioner filed a petition for post-conviction relief, alleging the ineffective assistance of counsel.  The post-conviction court denied the petition, and the petitioner now appeals.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined.  JERRY L. SMITH, J., not participating.

Jeffrey D. Ridner, Manchester, Tennessee, for the appellant, James W. Gann, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; and C. Michael Layne, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, the proof revealed that "[o]n December 6, 2000, firefighters responding to a fire at the residence of the victim, Willard Morris, Jr., discovered the victim's body under a pile of blankets."  State v. Gann, 251 S.W.3d 446, 451 (Tenn. Crim. App. 2008).  The "victim's shirt was soaked with blood[,] and . . . his clothing had been stuffed with paper."  Id.  Police discovered the petitioner's blood on a calendar and on a poster board that was underneath the victim; additionally, blood from the petitioner and the victim was found on two pieces of toilet paper.  Id. at 452, 454.

Timmy Brawley testified that on December 5, 2000, he and the petitioner went to the victim's house and bought cocaine. Id. at 452, 454. They left the victim's house, bought and used more cocaine and Dilauded, and ultimately returned to the victim's house. Id. at 452, 454. The petitioner initially asked Brawley to wait outside then told Brawley to go buy cigarettes for the victim. Id. at 452-54. Brawley returned, and the three of them used more cocaine. Id. at 453. The victim and the petitioner argued about money and cocaine. Id. Brawley went home at 3:45 a.m., leaving the victim and the petitioner in the kitchen with a large amount of cocaine. Id. The petitioner was wearing a blue flannel jacket, a t-shirt, baggy pants, and tennis shoes. Id.

When Brawley drove to work later that morning, he saw police responding to a fire at the victim's house. Id. at 453. After Brawley learned the victim was dead, he contacted police and ultimately agreed to wear a wire to record a conversation between himself and the petitioner at the petitioner's residence. Id. at 452, 453. Although parts of the recording were "distorted," it revealed that the petitioner told Brawley that his wife had scratched his cheek and poked him in the eye. Id. at 452. During the recording of the conversation, the petitioner and Brawley left the residence and were stopped by police who asked them to come in for questioning. Id. The recording revealed that as Brawley and the petitioner drove to the police station, the petitioner "told Brawley, 'We are the only alibi that each other's got.'" Id. at 452. The petitioner also asked Brawley to say that the petitioner left the victim's residence with Brawley. Id. at 453.

When they arrived at the police station, the petitioner waived his Miranda rights and made a statement, acknowledging that he had smoked crack cocaine with the victim and Brawley at the victim's residence before leaving around 4:30 a.m. Id. The petitioner maintained that the scratches on his hands occurred when he ran from police on a prior occasion. Id. Following the statement, police took the petitioner to the hospital to have blood drawn for DNA testing, and the petitioner was arrested. Id.

Michael McKay, a neighbor of the victim, testified that around 7:45 a.m. on December 6, 2000, he saw someone leave the victim's house; the person was wearing dark sweat pants, a red and black checked shirt, and a navy toboggan and was carrying a garbage bag. Id. The person unhurriedly walked down the street and repeatedly looked back at the victim's house. Id. McKay initially believed the person, who he described as approximately 5'4" tall with a slim build and shoulder-length hair, was a woman. Id. However, he subsequently identified the petitioner from a photograph lineup as the person he saw leaving the victim's house. Id.

The autopsy, which was performed by Doctor Feng Li, revealed that the victim had been stabbed seventy-seven times and that he had numerous blunt force trauma injuries. The victim died as a result of the multiple stab wounds. Id.

The petitioner testified that he and Brawley went to the victim's house, bought cocaine, left the victim's house, bought and used cocaine and Dilauded, and returned to the victim's house where they used more cocaine. Id. at 452, 454. Brawley left to buy the cigarettes for the victim. Id. at 454. Thereafter, the petitioner heard a car enter the driveway, and he went into the bathroom. Id. When he heard sounds of a struggle, he emerged to see Brawley "'sticking'" the victim. Id. The petitioner tried to intervene and was knocked unconscious. Id. When he regained consciousness, he was on the floor with paper stuffed in his clothes. Id. The petitioner smelled smoke and left without checking on the victim. Id.

The petitioner was convicted of first degree murder, arson, and setting fire to personal property, and, on direct appeal, this court affirmed his convictions. Id. at 451.

Thereafter, the petitioner filed one original and two amended petitions for post-conviction relief, arguing, in pertinent part, that his trial counsel was ineffective. Specifically, the petitioner complained that counsel failed to maintain adequate communication with him; failed to obtain an audible copy of the audiotape of his conversation with Brawley; did not move to suppress the petitioner's statement to police; did not request curative jury instructions after his objections were sustained; and did not object to the State's closing argument.

At the post-conviction hearing, the petitioner testified that he was appointed trial counsel and that trial counsel was assisted by co-counsel and a criminal investigator, Dale Conn (collectively "the defense team"). The petitioner said that after trial counsel was appointed, he was moved from the Coffee County Jail to Riverbend Maximum Security Penitentiary ("Riverbend"). He stated that while he was at Riverbend, the defense team met with him only once.

Approximately eleven days before trial, the petitioner was transported to the Coffee County Jail. The petitioner said that while he was in jail, most of his meetings were with co-counsel. He stated that he met with her several times. During the meetings, they examined pictures from the crime scene, reviewed the proof to be presented at trial, and discussed the possible suppression of his statement. He said that co-counsel informed him about the issues surrounding each witness's credibility and that they discussed the methods that co-counsel and trial counsel would use during cross-examination. The petitioner stated that he thought

co-counsel and trial counsel would participate equally in the cross-examination of trial witnesses.

He said that he occasionally met with Conn, who told him about the DNA evidence obtained from the crime scene. The petitioner admitted that trial counsel visited him on some occasions with the other members of the defense team, but he contended that those visits were infrequent. The petitioner stated that he explained the events surrounding the victim's murder to the defense team and reviewed his police statement with them.

The petitioner believed that because his visits with trial counsel were sporadic, trial counsel did not know enough information about his case. However, the petitioner conceded that he knew co-counsel and Conn reported to trial counsel the information derived from their meetings with the petitioner.

The petitioner complained that trial counsel failed to listen to the contents of an audiotape, which contained a recorded conversation between him and Brawley. The petitioner believed that this failure limited counsel's ability to address the audiotape at trial. The petitioner said that trial counsel informed him that the audiotape was inaudible and that he could not understand a word on it.

The petitioner complained that trial counsel failed to request curative jury instructions after the trial court sustained five of his objections, which precluded him from raising the issues in later court proceedings. However, the petitioner could not identify any specific objections requiring curative instructions and could not explain how trial counsel's failure to request the instructions was prejudicial.

The petitioner further contended that trial counsel should have objected to the State's closing argument, during which the State compared the petitioner to Charles Manson. The petitioner stated that he "felt like they put their personal opinions and their personal feelings got involved, and [he] believe[d] that the jury listened to every word they said and took it to heart."

Co-counsel testified that she met with the petitioner once at Riverbend and at least four times at the Coffee County Jail. She thought trial counsel was present for about half of those meetings. She said that she acted as an intermediary between the petitioner and trial counsel.

She recalled discussing with the petitioner the potential cross-examination of Brawley and McKay. She maintained that she did not agree with trial counsel's cross-examination of Brawley. She explained that trial counsel "was very calm and thorough," whereas co-

counsel "wanted to do a lot of jumping and screaming." She stated that trial counsel was a "seasoned veteran . . . [who] handled it how he wanted."

Co-counsel and the petitioner discussed his statement and the possibility that the statement could be suppressed due to the appellant's drug use. She stated she could not recall who made the decision not to move for suppression of the statement.

Co-counsel noted that when the defense team received the audiotape of the petitioner's conversation with Brawley, the tape was inaudible. However, during trial they learned that they had been playing the tape at the wrong speed. The State gave the defense team the proper equipment to listen to the tape, and the trial court recessed the trial overnight to allow the defense to listen to the tape. Co-counsel said that some portions of the tape were still "garbled and . . . hard to hear" and that certain audible portions of the tape were damaging to the petitioner's case.

She heard the State compare the petitioner to Charles Manson during the closing argument but did not object to the characterization because trial counsel did not object. She stated that she regretted not objecting. Regardless, she thought the outrageousness of the closing argument possibly hurt the State's credibility.

Co-counsel conceded that she did not request curative instructions after the defense's objections were sustained. However, she believed the trial court "issued some type of statement, and that may have been taken by me as curative."

Dale Conn, the criminal investigator, testified that the initial meeting at Riverbend between the petitioner and the defense team lasted between two and four hours. He opined that the State's case against the petitioner was "pretty strong," particularly in light of the evidence of the petitioner's blood at the scene.

Trial counsel testified that he was appointed to represent the petitioner and that he met with the petitioner on several occasions to discuss his case. Specifically, trial counsel stated that he visited the petitioner at least four times while he was incarcerated at the Coffee County Jail and once while he was incarcerated at Riverbend. Additionally, trial counsel said that co-counsel and Conn spoke with the petitioner on the telephone and in person on multiple occasions. Trial counsel said the defense team reviewed the petitioner's case and discussed the witnesses with the petitioner.

Trial counsel testified that the petitioner told the defense team that he did not participate in the victim's murder but that he was present at the murder scene. When trial counsel learned that the State's DNA evidence showed that the petitioner's blood was

underneath the victim's body and on a piece of toilet paper at the crime scene, he believed the evidence against the petitioner was extremely strong. Therefore, he engaged the State in plea negotiations. Trial counsel wrote the petitioner a letter that "pretty well outlined exactly what happened," and co-counsel delivered the letter to the petitioner. Trial counsel advised the petitioner to plead guilty. However, the petitioner did not want to plead guilty.

Trial counsel stated that the petitioner claimed to be under the influence of drugs when he gave a statement to police saying that he smoked crack cocaine with the victim and Brawley at the victim's residence, that he took a cab home from a nearby market after he left the victim's home, and that police would not find his blood at the victim's residence. Trial counsel testified that he consulted the defense team and two police investigators who spoke with the petitioner after he waived his Miranda rights. Trial counsel said the defense team noticed that the petitioner's statement to police matched the one he told them. The investigators acknowledged that the petitioner was clearly under the influence of "something," but they maintained that the petitioner "was coherent, that he could narrate what had happened, and his participation in it, which he denied." Accordingly, trial counsel concluded that the petitioner's statement was not "suppressible."

Trial counsel said that he did not request curative instructions after the trial court sustained his objections because the trial court told the jury that they should disregard the statements.

Trial counsel agreed that the State made improper comments during closing argument. However, he did not object because he believed the comparison between the petitioner and Manson was inapt and clearly outrageous. Trial counsel also stated that he thought the closing argument was so egregious that it may have turned the jury against the prosecution.

The post-conviction court entered a written order, denying the petition. The post-conviction court concluded that the petitioner had failed to meet his burden of establishing by clear and convincing evidence that trial counsel was deficient or that the petitioner was prejudiced by such deficiency. The petitioner now appeals.

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. §40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's finding of facts de novo with a presumption that those findings are correct. See Fields, 40 S.W.2d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Notably,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance of claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the petitioner complains that his trial counsel erred by failing to: (1) maintain adequate communication with him; (2) obtain an audible copy of the audiotape of his conversation with a witness; (3) suppress his statement to police; (4) request curative jury instructions; (5) and object to prosecutor's closing argument.

The post-conviction court found that trial counsel maintained sufficient contact with the petitioner, noting that trial counsel visited the petitioner at the jail and the penitentiary

and that he had multiple meetings with the petitioner shortly before trial. Regarding the audiotape of the petitioner's conversation with Brawley, the post-conviction court noted that during trial, trial counsel was provided with a transcribed copy of the recording and was allotted time to review it. The post-conviction court concluded that the petitioner failed to show prejudice.

The post-conviction court accredited the testimony of trial counsel and co-counsel regarding the discussions they had concerning the statement the petitioner made to police. The post-conviction court found that because trial counsel determined that the petitioner was coherent when he gave his statement to police, trial counsel made a tactical decision to not file a motion to suppress.

Regarding trial counsel's failure to request curative jury instructions, the post-conviction court noted that the trial court "properly instructed the jury to disregard statements made by counsel not supported by the evidence [and] also gave the instruction concerning objections and rulings by the [trial court]." The post-conviction court stated that the trial court instructed the jury that when evidence did not support statements made by trial counsel, the jury was to disregard those statements.

Finally, the post-conviction court recognized that trial counsel failed to object to the State's prosecutorial misconduct during closing argument; however, the post-conviction court noted that neither counsel's inaction nor the State's closing argument altered the jury verdict and that the petitioner failed to prove that trial counsel's failure to object was not a tactical decision.

The petitioner maintains that on direct appeal this court determined that "[t]he improper argument would have warranted a new trial had an objection been raised." Although this court did conclude that the prosecutor's comments "were improper, inflammatory, and utterly indefensible as they violate nearly every rule established for proper closing argument," we also concluded that the comments "were so improper that it is our view that no reasonable attorney would have failed to object out of simple inadvertence or neglect." Gann, 251 S.W.3d at 462. To this end, this court observed that

> it is difficult to know, upon a cold reading of the record, what effect the prosecutor's comments had on the jury. It is certainly possible that the argument was so outrageous that the prosecutor lost more credibility than he gained. If that were the case, then the failure to object could have been a reasonable tactical decision.

Id. Accordingly, our opinion on direct appeal bolsters the post-conviction court's finding that counsel made a strategic decision to not object to the State's closing argument. Moreover, we note that the post-conviction court determined that given the overwhelming evidence presented against the petitioner at trial, he suffered no prejudice. We conclude that the evidence does not preponderate against the post-conviction court's findings.

### III.  Conclusion

Because the petitioner failed to establish that his trial counsel was ineffective, we conclude that the post-conviction court did not err in denying post-conviction relief.


_____
NORMA MCGEE OGLE, JUDGE