# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 21, 2010

## STATE OF TENNESSEE v. DEADRICK EUGENE GARRETT

**Appeal from the Criminal Court for Knox County**
**No. 91889     Mary Beth Leibowitz, Judge**

---

**No. E2010-00954-CCA-R3-CD - Filed January 24, 2011**

---

A Knox County Criminal Court jury convicted the defendant, Deadrick Eugene Garrett, of first degree premeditated murder in the shooting death of Dyishun Foust,[1] and the trial court imposed a sentence of life imprisonment with the possibility of parole. In this appeal, the defendant challenges the sufficiency of the convicting evidence. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Christopher M. Rodgers, Knoxville, Tennessee, for the appellant, Deadrick Eugene Garrett.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Kelly Green testified that she was working the drive-thru window at Smoothie King on the corner of Walker Springs Road and Kingston Pike on May 2, 2009, when she heard gunshots and saw a brown, older model station wagon drive away from the Shoney's restaurant located in front of Smoothie King. When she looked toward Shoney's, Ms. Green saw the victim fall to the ground and "start[] convulsing." Ms. Green called 9-1-1.

---

[1]The victim's name is spelled alternatively "Dyishun" and "Dyshun." As is the policy of this court, we will utilize the spelling contained in the indictment.

Knoxville Police Department ("KPD") crime scene officer Gerald Smith arrived at the scene shortly after Ms. Green's 9-1-1 call and observed the deceased victim, Dyishun Foust, lying in the parking lot with a single gunshot wound to his chest. Two cartridge cases lay on the ground, and the second bullet was discovered inside Shoney's, having penetrated the window. Officer Smith also found a pair of sunglasses, an Atlanta Braves ball cap, and a cellular telephone near the victim's body. Parked immediately adjacent to the victim's body, Officer Smith found a 1990 Mazda 626 with the driver's side door open. Officer Smith lifted latent fingerprints from the interior of the car, which was registered to the victim's mother. KPD Forensic's Officer and Fingerprint Examiner Dan Crenshaw examined those prints and determined that one of the lifted prints matched the defendant's right thumb print.

KPD Investigator Nevin Long responded to the scene of the victim's murder and acted as an assistant to lead investigator Jeff Day. After the victim's cellular telephone was processed for fingerprints and other physical evidence, Officer Long went through the recent call and text history on the telephone. According to Officer Long, there were some calls and several text messages transmitted within two hours of the victim's death between the victim's number and a cellular telephone owned by Beverly Spears. Another number on the victim's call history was traced to a land line belonging to Joyce Talton, who told Officer Long that Ms. Spears had used her telephone on several occasions after Ms. Spears lost her cellular telephone. Based upon this information, officers obtained a search warrant to procure more detailed telephone records. Officers later learned that the defendant was using Ms. Spears's cellular telephone to contact the victim.

Twenty-one-year-old Beverly Spears testified that she began living with the defendant and his parents when she was 14 years old and that the two of them had three children together. At some point, Ms. Spears began living on her own in Lenoir City. The defendant stayed with her sometimes, but their relationship was not exclusive. She explained, "He was doin' his thing so I thought I could do mine." In early May 2009, Ms. Spears was working at Sonic in Farragut with the victim. The two began an intimate relationship at some point, and on May 2, 2009, Ms. Spears contacted the victim via text message and asked him if they could "get a room that night." The victim responded, "Quit bull shit[t]in," which Ms. Spears explained was what he always said to her. Ms. Spears stated that she told the defendant, who was at her house when she sent the text message, that she was going out with her girlfriends that night. Later that same afternoon, Ms. Spears noticed that the defendant had taken her cellular telephone when he left the residence. She then went to Ms. Talton's to call the victim, but he did not answer.

Ms. Spears said that she later went to the defendant's mother's house at approximately 6:00 p.m. and that while she was there, the defendant and his brother, Dyron

Isom, pulled into the driveway in Mr. Isom's Volvo station wagon. Ms. Spears recalled that the defendant had been shot in his forearm and that he "had a shirt or something wrapped around" the injury. Ms. Spears drove the defendant to a Walgreens to purchase a first aid kit. She then drove him to her residence, where she treated his wound. She then traveled with the defendant to a motel off Cedar Bluff Road, where the two stayed all night. While at the motel, Ms. Spears learned that the victim had been killed. The next morning, the pair left the motel together, and Ms. Spears drove the defendant to his mother's house before returning home.

At some point that evening, the defendant returned her cellular telephone. Ms. Spears admitted that she told Officer Day that she had checked her messages and that they had been erased when the defendant returned it to her.

At the time of the victim's murder, Ms. Spears was expecting a baby, and she believed that the victim was the father. She later miscarried the child. Ms. Spears admitted telling Officer Day that she had told the defendant of the victim's fathering her unborn child. Ms. Spears also admitted telling Officer Day that the defendant said, "I think I killed dude."

Officer Long obtained videotapes taken from three different security cameras at Shoney's and other nearby businesses. A security camera videotape from Regions Bank showed that a yellow Volvo station wagon pulled into the bank parking lot at 6:10 p.m. on May 2, 2009. Two individuals left the vehicle from the rear passenger's side and walked toward the Shoney's parking lot. One minute later, a small black pickup truck pulled into the bank parking lot and parked next to the Volvo. Two minutes later, both vehicles left the bank parking lot. A security camera videotape from Shoney's showed the victim's entering the restaurant at 6:08 p.m. The victim was talking on a cellular telephone and appeared to be looking for someone inside the restaurant. The victim appeared to leave the restaurant at 6:11 p.m. but then returned to within camera range at 6:13 p.m. Four minutes later, he is seen speaking to one of the Shoney's employees. A videotape from a second security camera located at the rear of Shoney's showed the victim and another man involved in "a scuffle" and the Volvo as it moved across the parking lot. The video captured the victim's falling to the ground just after 6:19 p.m., and shortly thereafter, a black male can be seen looking back at the victim from the passenger's seat of the Volvo. Officer Long later learned that the Volvo belonged to the defendant's brother, Dyron Isom.

The defendant's cousin, 21-year-old Emmanuel "Sting" Fine, testified that on May 2, 2009, he received a call from the defendant asking Mr. Fine to meet him at the Avalon West apartment complex. Mr. Fine's friend, James Mell, accompanied him to Avalon West, where they met the defendant and Mr. Isom. Mr. Fine stated that he and Mr. Mell got into the yellow Volvo and that the men prepared for "a fight" between the defendant

and the victim. Mr. Fine admitted telling officers that the defendant expressed his intent to "mess [the victim] up bad" and that the defendant had a handgun in the vehicle. When the victim drove by, the men in the Volvo pulled out to follow him. When the victim pulled into the Shoney's parking lot, the men pulled into the adjacent Regions Bank lot, and the defendant "jumped out of the car." Mr. Fine said that at that point he asked the defendant to take him back to his car because the situation "just didn't feel right."

Christopher Gouge was working as a cashier at Shoney's on May 2, 2009, when the victim came into the restaurant and said he was looking for a large party that he was to meet at the restaurant. Mr. Gouge told the victim that no large parties had come in and permitted the victim to look around the restaurant. The victim then went outside and came back into the restaurant a few minutes later and asked Mr. Gouge if he had seen the victim's car keys. When Mr. Gouge replied in the negative, the victim left the restaurant a second time.

The defendant's brother, Dyron Isom, testified that on May 2, 2009, the defendant asked him for a ride to the Avalon West apartment complex. Mr. Isom drove the defendant to Avalon West in his yellow Volvo station wagon, where they met Mr. Fine and Mr. Mell. As they drove to Avalon West, the defendant was using Ms. Spears's cellular telephone to send text messages. At some point as the men sat at Avalon West waiting for the victim, Mr. Isom became aware of the purpose of their travels "when they was all talking and [the defendant] pulled . . . out" a black pistol. Mr. Isom recalled that the defendant stated his intent to use the gun before they left to go toward Shoney's. After they parked in the Regions Bank parking lot, the defendant got out of the Volvo, walked over to the victim's car, and returned to the Volvo with the victim's car keys. At that point, Mr. Isom asked the defendant if they could leave, and the defendant agreed. Mr. Isom then drove back to Avalon West, where he dropped off Mr. Fine. Mr. Isom stated that he believed that he and the defendant would return to their home on Ebenezer Road after dropping off Mr. Fine.

When they reached the area of Shoney's, the defendant directed Mr. Isom to pull into the Shoney's parking lot. Mr. Isom described what happened next:

> I pulled up and [the defendant] got out of the car and grabbed the gun. And I was so nervous that I was watchin' my surroundings, and I don't know. I heard two gunshots. I look over and they was scufflin' in the parking lot. And I get out to scream "stop". And about the time I got out, [the defendant] was already runnin' back to the car. And then I ran back to the car. And then we hopped in the car, and he told me to gas it and I left.

Mr. Isom stated that the entire exchange took no "more than ten seconds." When they arrived back at their mother's residence, Mr. Isom telephoned a friend to pick him up, leaving the defendant at the residence with their mother and Ms. Spears.

During cross-examination, Mr. Isom stated that the defendant never expressed an intention to murder the victim but did express an intention to fight the victim. When the defendant got back into the car after shooting the victim, his arm was bleeding, and he told Mr. Isom that he had been shot.

Telephone records from both the victim's and Ms. Spears's cellular telephones established that the victim and Ms. Spears exchanged several text messages on the morning of May 2, 2009, arranging to get a motel room together that evening. The records also established that the defendant, who was using Ms. Spears's telephone, and the victim exchanged several text messages in the hours leading up to the victim's death. Beginning at 4:17 p.m., the following text message exchange took place between the defendant, who was posing as Ms. Spears, and the victim:

> Defendant: Where you at?
> Victim: Out east. Where you want to meet at?
> Defendant: Walmart on Cedar Sprints.
> Defendant: Walker Springs.
> Victim: Cool.
> Victim: Time girl?

At 4:30 p.m., the defendant sent the victim a text message that read, "Now at garden section." That message was followed immediately by another message that read, "What car you in?" Three minutes later, the victim responded, "Give me ten minutes." The response from Ms. Spears's telephone read, "K." At 4:42 p.m., the following text message exchange began:

> Defendant: Meet me at Avalon West.
> Victim: Cool.
> Defendant: Pull in first left, come in building 5.
> Defendant: Phone dead.
> Victim: Come out.
> Defendant: Where you at?
> Victim: I'm out here.
> Defendant: Come on, phone dead.
> Defendant: Forget it then, okay.
> Victim: You lie too much.

During the time that the text messages were being exchanged, the victim attempted to call Ms. Spears's cellular telephone, but the defendant did not answer.

After linking the defendant to the murder through the telephone records, KPD Violent Crimes Investigator Jeff Day, who acted as lead investigator in the case, obtained a warrant to search the defendant's residence and any curtilage. Officers did not find the murder weapon or the victim's car keys. Two days later, the defendant's lawyer contacted Officer Day and indicated that the defendant would turn himself in and would show authorities where the murder weapon had been abandoned, but he would not answer any questions. The defendant led Officer Day to a location on Fort Loudon lake where he claimed to have disposed of the weapon. Dive teams were unable to recover the weapon.

Knox County Deputy Chief Medical Examiner Doctor Stephen Cogswell performed the autopsy of the victim's body and determined that the cause of death was a single gunshot wound to the chest. "[T]he bullet entered the chest pretty much in the center, just left of center, on the breast bone. Adjacent to the gunshot wound over on the right side of the breast bone was a small abrasion on the inside of the . . . muscle of the chest wall here." The abrasion to the right side of the victim's chest indicated that the victim's "arms were together forming a deeper valley in his chest than if he had been standing upright and straight with his arms pulled back." The bullet traveled through the victim's heart and left lung before exiting through the rib cage and becoming trapped under the skin of the back. The victim lived "for some time," as long as two to three minutes, after being shot. The victim also sustained superficial injuries to his face and hands that Doctor Cogswell said could have been caused by the victim's hitting the pavement after being shot.

Upon examining photographs of the gunshot wound to the defendant's arm, Doctor Cogswell determined that the bullet entered the defendant's arm "closer to the elbow" and that "the exit wound is going to be the one farther away from the elbow closer to the wrist." A blackened area around the entrance wound indicated that the shot was fired from a very close range. Doctor Cogswell testified that it was possible that the same bullet that caused the wound to the defendant's arm also caused the victim's death.

During cross-examination, Doctor Cogswell testified that the superficial injuries to the victim's hands could also be consistent with the two men struggling, as would the right chest abrasion.

An audiotape recording of a telephone call the defendant placed from the Knox County Detention Center contained the following statement by the defendant:

Baby, it's first degree premeditated; it's different than just first

degree. This is premeditated. That means I left and came back. I took his keys though so he couldn't go nowhere and I dropped Sting and them off and came back 'cause they was . . . scared and shit so I dropped them off and came back. That's not good, baby. That's planning; that's planning.

Later in the same conversation, the defendant admitted telling two girls in the paddy wagon that he "w[h]acked somebody in public."

Following the presentation of this evidence, the State rested.

The 21-year-old defendant testified that on May 2, 2009, he was awakened by a text message coming in to Ms. Spears's cellular telephone. When asked to describe his relationship with Ms. Spears, the defendant said, "Hum, she was close to me. . . . I mean to her I'm referred [to] as her baby daddy," and added that the two had dated since the age of 14. The defendant admitted reading the message and some others that he "kind of didn't agree with." The defendant said that after reading the messages, he "took her phone and walked out the door." He went to his mother's house, where he asked Mr. Isom to "run [him] down the street." The defendant said that his intent was to go to the Avalon West apartment complex to meet the victim and that he used Ms. Spears's cellular telephone to "lure [the victim] in to Avalon." The defendant said that he wanted to meet with the victim to "confront him and see who he was" and that he wanted to fight the victim. The defendant admitted arming himself with the nine millimeter Ruger before leaving his mother's house.

After seeing the victim drive by while he sat at Avalon West, the defendant decided to follow the victim rather than fight him there. The defendant said that the first time the men went to Shoney's, he "was gonna yell, but [he] didn't want to start no trouble." At that point, Mr. Fine said they should leave because of all the cameras around. The defendant stated that he took the victim's keys because he was "tryin' to be funny." The defendant testified that at that point he had given up on the plan to fight the victim. He said that he reconsidered when he saw the victim walk out of Shoney's as he and Mr. Isom drove past toward their residence. He told Mr. Isom to pull into the Shoney's parking lot.

The defendant said that he jumped out of the car to confront the victim and that he took the gun only to "shake him up, scare him" and to let the victim know he was "serious about" his relationship with Ms. Spears. The defendant claimed that the victim grabbed for the gun, the two struggled, and the gun went off. As they continued to struggle, the victim "started shakin' and fell." At that point, the defendant "grabbed the gun and jumped in the car and told Dyron to leave." At the same time, the defendant realized that he had been shot.

-7-

The defendant claimed that in the recorded conversation from the jail, he was trying to explain to Ms. Spears the facts of his case as related to him by his previous attorney. The defendant also claimed that the shooting was an accident and that he had "no control" over the gun when it discharged.

During cross-examination, the defendant admitted that he used Ms. Spears's telephone and pretended to be her for the purpose of luring the victim to an isolated place where the defendant could confront the victim. He also admitted that he asked 16-year-old Mr. Isom to drive him to meet the victim even though he had his own car and conceded that he invited Mr. Fine because he "wanted [his] family with him." The defendant acknowledged searching the victim's car before taking his keys and admitted that if he had seen a weapon in the victim's car, he would have taken it so that the victim would have no means of protection. He conceded that he did not go to the hospital immediately to be treated for the gunshot wound because he did not want the police to be called in. The defendant admitted writing a letter to Ms. Spears's mother wherein he said, "I killed a poor boy over your daughter and you can't say that ain't love."

The defense rested, and James Mell testified in rebuttal for the State that when he initially met with the defendant at Avalon West, he noticed that the defendant was wearing a number of rings on his fingers. Mr. Mell said, "You're going to mess him up; ain't ya?" The defendant responded by lifting up his shirt and showing Mr. Mell the handgun in his waistband.

Following the denial of his timely-filed motion for new trial, the defendant filed a timely notice of appeal to this court. In his appeal, the defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to establish that he premeditated the victim's murder. The State contends that the evidence supports the defendant's conviction. We agree with the State.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654. Although a criminal offense may be established exclusively by circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); *Winters*, 137 S.W.3d at 654, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis

save the guilt of the defendant." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987) (quoting *Crawford*, 470 S.W.2d at 613).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202 (2006). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007)*; see also State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* § 7.7 (2d ed. 1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the

particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

The evidence adduced at trial established that the defendant, upon discovery of the victim's romantic relationship with Ms. Spears, took Ms. Spears's cellular telephone and used it to send text messages to the victim that were designed to lure the victim to a location where the defendant could attack him. Before arranging the meeting with the defendant, the defendant armed himself with a weapon and gathered reinforcements in the persons of Mr. Isom, Mr. Fine, and Mr. Mell. After observing the victim's car parked in the Shoney's parking lot, the defendant went to the car to search for any weapons so that he could leave the victim unprotected. He then took the victim's car keys, effectively stranding the victim in the parking lot. The defendant and Mr. Isom then returned Mr. Fine to Avalon West. As the defendant and Mr. Isom drove back to their mother's residence, the defendant saw the victim leave Shoney's and directed Mr. Isom to pull into the restaurant parking lot. He then jumped out of the car armed with the gun. A brief struggle ensued, and the defendant shot the victim directly in the heart. The victim fell, and the defendant fled.

The defendant's using Ms. Spears's telephone to pose as Ms. Spears and lure the victim into the defendant's home turf, his asking Mr. Isom to drive him rather than driving his own vehicle, and his gathering of reinforcements rather than seeking a one-on-one meeting with the victim, all suggest a high level of planning on the part of the defendant as well as a desire for a violent encounter. In addition, the defendant's stranding the victim in the Shoney's parking lot also bespeaks a level of forethought. Finally, the defendant's procuring a weapon before his meeting with the victim and then using that weapon to shoot the unarmed victim also support the jury's finding that the defendant premeditated the victim's murder. That the defendant and the victim engaged in a brief struggle before the defendant shot the victim does not undermine the jury's finding.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE