# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 18, 2012

## STATE OF TENNESSEE v. DESHAUN EMMANUEL BROWN AND JEROME CARDELL HOLT

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-A-556      J. Randall Wyatt, Jr., Judge**

**No. M2011-01383-CCA-R3-CD -Filed December 10, 2012**

The appellants, Deshaun Emmanuel Brown and Jerome Cardell Holt, pled guilty in the Davidson County Criminal Court to ten counts of aggravated rape, two counts of aggravated robbery, one count of especially aggravated kidnapping, and one count of reckless endangerment. The trial court sentenced Appellant Brown to a total effective sentence of 60 years and Appellant Holt to a total effective sentence of 72 years in the Tennessee Department of Correction. On appeal, the appellants challenge the sentences imposed by the trial court. Upon review, we affirm the judgments of the trial court; however, we must remand for entry of corrected judgments for the aggravated rape convictions to reflect that each appellant is a multiple rapist rather than a violent offender as indicated on the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

David M. Hopkins, Nashville, Tennessee, for the appellant, Deshaun Emmanuel Brown.

David A. Collins, Nashville, Tennessee, for the appellant, Jerome Cardell Holt.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Ben Ford, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

On March 16, 2009, the appellants were indicted by the Davidson County Grand Jury in indictment number 2010-A-556 on twenty counts of the aggravated rape of C.M.[1]; one count of the especially aggravated kidnapping of C.M.; one count of employing a firearm during a dangerous felony; two counts of aggravated robbery, with the victims being C.M. and Stephen Pinson; and one count of the reckless endangerment of Pinson. Thereafter, the appellants pled guilty to ten counts of aggravated rape, one count of especially aggravated kidnapping, two counts of aggravated robbery, and one count of reckless endangerment.

At the guilty plea hearing, the State provided the following factual basis for the appellants' guilty pleas:

> [I]n case 2010-A-556[,] . . . the State would have shown that on July 8, 2009[,] just before midnight [C.M.] and Mr. Stephen Pinson had just returned from work and to their apartment at 629 Heritage Drive here in Davidson County.
>
> They had gone grocery shopping and had just put up their groceries and were about to sit down to watch a movie when there was a knock at their door. The person on the other side asked if they could use the phone. . . . Mr. Pinson attempted to look through the peephole, but the peephole was broken[,] and [he was] unable to see through it.
>
> At that point in time[,] he cracked the door to see who was on the other side when two unknown black males[,] one armed with a large revolver[,] pushed their way through the door. One of the suspects had his face covered. The one with the uncovered face was the man who held the gun.
>
> They forced Mr. Pinson and [C.M.] to [lie] face down on the floor. One of the suspects disabled the phone and their computer. They then took approximately $50 from [C.M.'s] purse and Mr. Pinson's wallet.

---

[1] It is the policy of this court to refer to the victims of sexual crimes by their initials.

They were also ransacking the house and looking for other items to take. They took cell phones and other small items as well. After several minutes, the suspect with the gun then forced [C.M.] to go to the back room[,] and they forced Mr. Pinson to remain [lying] on the floor in the living room where they covered him with a blanket so that he could not see.

When they took [C.M.] into the back room[,] they then forced her to perform sexual acts with them. During this period of time[,] they alternated between the two of them. They had pen[ile]/vagina[l] intercourse with [C.M.] at least three times. They forced her to perform oral sex and penetrated her orally with their penis at least four times.

On one occasion[,] one of the suspects digitally penetrated her anus. One of the suspects also performed oral sex on her[,] and finally one of the suspects . . . inserted an object into [C.M.]. She does not know what object it was, but feels that it was cold[,] and it is hypothesized that it was the gun.

During this time[,] Mr. Pinson was [lying] in the living room[,] and one of the individuals[,] they were taking turns with [C.M.] in the back room, whoever was not with [C.M.] would come out. Mr. Pinson on several occasions felt the gun pressed to the back of his head[,] and the subjects kept taunting him in a manner such as please give me a reason to kill you.

At one point[,] Mr. Pinson[,] who had made his peace and determined that he was probably going to die that evening[,] realized that both individuals were back with [C.M.] in the back bedroom. At that point in time[,] he was overcome with the urge to try to run for help. Mr. Pinson got up and ran from the apartment[,] and upon the door slamming[,] the two individuals stopped raping [C.M.,] and they chased after Mr. Pinson[,] who ran down the street looking for help.

He said he could hear them yelling after him[,] and he heard what he thought were gunshots fired. At some point[,] he ducked behind someone's house to hide from these individuals and started banging on their door. The couple that he awoke

called the police thinking that he was trying to break into their apartment.

Officers eventually arrived and spoke with Mr. Pinson[,] who took them back to his apartment where they found [C.M.], who was alive, but obviously in bad shape. They then called out detectives and crime scene investigators. They were able to recover several condoms that had been used.

There was also sperm from the ejacula[te] from [C.M.'s] stomach which was collected. These items were sent out to the TBI lab[,] and several months later in October of 2009[,] they returned their results to the police department.

There were three male DNA profiles developed[,] one of which belonged to Mr. Pinson, and there were two others which were [put] into the combined DNA index system or CODIS[, which] returned and identified a DNA profile as belonging to [Appellant Holt]. There was a second DNA profile that was not identified by CODIS.

In February of 2010, [Appellant Holt] was located and was taken into custody on probation violation warrants. He agreed to speak to Detective Jason Terry. When presented with the DNA evidence, [Appellant Holt] then stated that he would talk to Mr. Terry.

He stated that he[,] and he could not remember [Appellant Brown's] name and only knew him at that time as "D[,]" had gone out with a woman driver and pulled into the Heritage, the apartments located at 629 Heritage Drive[,] and they were intending on getting a hit, trying to rob someone who was there.

The first apartment that they looked into had too many people in it[,] and they decided that . . . was not an easy target. They then looked into another apartment[,] which unfortunately was that of [C.M.] and Mr. Pinson's apartment.

They came up with a plan in which one of them would

-4-

knock on the door and ask to use the phone and say it was an emergency in an attempt to gain access to the apartment. He stated that he covered his face using his undershirt and that [Appellant Brown] was the one who did not cover his face[,] but he had a . . . large revolver which was a [.]357 magnum.

He then admitted that they robbed these two individuals and that they then forced [C.M.] to have sexual intercourse. He did, while he did not know the name of [Appellant Brown,] he did admit that they had been involved in another robbery and was able to identify the scene and location of that robbery.

Detective Terry then went back through police reports and indeed found a reported robbery from that location. Detective Rex Davenport was investigating that case and had already arrested [Appellant Brown] in that case.[2] Detective Terry was then able to . . . create a photographic line-up[,] which was presented to both [C.M.] and Mr. Pinson right after the preliminary hearing on [Appellant Holt].

While [C.M.] could not identify anyone[,] Mr. Pinson positively identified [Appellant Brown] as the second perpetrator. When [Appellant Holt] was then presented with a photographic line-up[,] he also identified [Appellant Brown] as the second perpetrator. . . . [Appellant Brown] was then arrested and taken into custody on a direct presentment as to this charge. Detective Terry collected DNA swabs from [Appellant Brown,] which were positively identified as the second unknown DNA profile that was recovered from the scene.

. . . .

. . . [I]n addition to [Appellant Holt] confessing[,] the State was able to obtain a telephone call between [Appellant Brown] and his mother in which he admitted his participation in this crime and admitted that he had gone in. He did not admit necessarily to the rape, but he did put himself at the scene and

---

[2]At the instant plea hearing, the appellants also pled guilty in case number 2010-A-557, the robbery case that was investigated by Detective Davenport.

admitted to robbing [C.M.] and . . . Mr. Pinson.

After the foregoing facts were recited, each appellant pled guilty to ten counts of the aggravated rape of C.M.; one count of the especially aggravated kidnapping of C.M.; two counts of aggravated robbery, one count relating to C.M. and the other relating to Pinson; and one count of the reckless endangerment of Pinson. The plea agreement provided that the trial court would determine the length and manner of service of the sentences.

At the sentencing hearing, C.M. testified that on the night of July 8, 2009, the appellants pushed their way into the apartment and made her and Pinson lie face-down on the floor. The appellants later put a gun to C.M.'s head, told her to stand, and led her to the bedroom. C.M. stated she "kind of knew what was going to happen." In the bedroom, the appellants ordered her to remove her clothes. She begged, "[N]o, please, please, no." The appellants put a gun to C.M.'s head, told her to shut up, and undressed her. They took turns raping her, with each man penetrating her vaginally and orally. One of them performed oral sex on her. Additionally, one of them penetrated her anally "[w]ith a finger, but nothing else, I told them I couldn't do that and I was practically hysterical and they didn't." She said that one of the appellants ejaculated on her stomach then forced his penis into her mouth. C.M. stated that during the rapes, "[T]hey asked me to call them daddy and to tell them that I liked it." Near the end of her ordeal, the appellants stuck "something cold" inside her, she did not know what it was, and she "started freaking out." At that time, the appellants left.

C.M. stated that she had been affected by the ordeal, explaining, "I can safely say that I am not the same person and I never will be." She maintained that she "was a shell for a long time" and that she still had difficulty trusting people. Specifically, C.M. stated, "I cannot look at a man the same way." C.M. said that the crimes contributed to the end of her relationship with Pinson. C.M. stated that because of the crimes, she left Nashville and went to the New England area. She said that she wanted the appellants to be "put away. I don't want to have to worry or be scared."

Stephen Pinson testified that on the night of the incident, he and C.M. were not surprised by the knock on the door because they worked in a restaurant and had "a lot of late-night visitors." Pinson opened the door, and Appellant Brown entered the room. Immediately thereafter, Appellant Holt entered the apartment. Appellant Holt's face was disguised, he pointed a gun at Pinson's chest, and he instructed Pinson and C.M. to lie face-down on the floor. The appellants asked for the victims' cellular telephones and money, took Pinson's "tip jar," and went through the apartment "being extremely destructive."

Pinson testified that when the appellants ordered C.M. to stand, they covered his head with his daughter's blanket. He heard C.M. crying as the appellants took her into the back

bedroom. The appellants took turns holding the gun, and Pinson recalled a couple of instances when a gun was put to the back of his head. Once, one of the appellants asked, "Give me one reason why I shouldn't go ahead and kill you now." Pinson responded, "Mercy." The perpetrator "said that answer will work or good answer or something like that."

Ultimately, Pinson ran away and woke an elderly couple who called the police. When the police arrived, Pinson told them what happened and took them to the apartment. He feared C.M. would be dead, but she was alive.

Pinson said that before the incident, he believed in God and expected good things from life. Afterward, he became anxious and lived in fear, "waiting for something bad to happen." He said that he relives the incident in his mind daily. He said that immediately thereafter, he became "what [his] therapist called hypervigilant" and had to stop working because he could not function.

Detective Rex Davenport testified that on June 30, 2009, approximately one and a half weeks prior to the instant offenses, the appellants robbed Noah Webster. During the crime, each appellant wore a bandana covering his face and held a handgun. Appellant Brown's fingerprints were found at the crime scene. When Detective Davenport interviewed Appellant Brown, he admitted his participation in the robbery and said that "his accomplice was Trey." Thereafter, Detective Davenport spoke with Detective Terry and learned that Appellant Holt "went by Trey." During an interview, Appellant Holt admitted to Detective Davenport his participation in the robbery.

No witnesses were presented on behalf of Appellant Holt. Doris E. Brown, Appellant Brown's paternal grandmother, testified on Appellant Brown's behalf. She said that when Appellant Brown was two years old, at the request of his mother, Mrs. Brown took him to Kansas City, Missouri, to raise.

Mrs. Brown said Appellant Brown was kind and respectful. When he lived with her, he was active in sports, went to church, sang in the choir, and helped in her nail salon. Mrs. Brown had Appellant Brown attend counseling to treat the "abandonment issues" he had because his mother was not involved in his life. Mrs. Brown presented twelve character reference letters from people who knew Appellant Brown while he lived with her.

Mrs. Brown stated that when Appellant Brown was almost fifteen years old, his father left Kansas City and moved to Nashville. Mrs. Brown said that Appellant Brown began misbehaving because he was upset that his father had left. Within three or four months, Appellant Brown moved to Nashville to live with his father. Shortly afterward, Appellant

Brown and his father began having problems, leading Appellant Brown to run away from home. Subsequently, at the order of a juvenile court, Appellant Brown went to live with his mother, who also lived in Nashville, and the instant offenses occurred around the same time.

Seventeen-year-old Appellant Brown testified that his grandmother had taken good care of him and that he did not get into any trouble when he lived with her. However, after he moved to Nashville, he started using drugs and alcohol because he did not feel welcomed by his father.

Appellant Brown said that he was fifteen years old, in tenth grade, and living with his mother when he was arrested. He expressed remorse for his crimes.

On cross-examination, Appellant Brown admitted that on June 30, he and Appellant Holt robbed a man at gunpoint, about a week later committed the instant crimes, and approximately one month later broke into a house. He acknowledged that his grandmother supported him financially and that he did not need to commit crimes for money. He said that he borrowed the gun from someone and that he used the same gun in all the crimes.

After the conclusion of the proof and the arguments of counsel, the trial court took the case under advisement. In the subsequent sentencing orders, the trial court sentenced Appellant Holt to twenty-three years for each conviction for aggravated rape (counts 1-10) and especially aggravated kidnapping (count 21) and ordered that one hundred percent of the sentences be served in confinement. Appellant Holt was further sentenced to ten years for each aggravated robbery conviction (counts 24-25) and two years for the reckless endangerment conviction (count 26), with thirty percent of those sentences served in confinement before release eligibility. The court ordered that counts 1, 2, 21, and 24 be served consecutively to each other but concurrently with the remaining sentences for a total effective sentence of 79 years.

The trial court sentenced Appellant Brown to twenty years for each conviction for aggravated rape (counts 1-10) and especially aggravated kidnapping (count 21) and ordered he serve one hundred percent of the sentences in confinement. Appellant Brown was further sentenced to ten years for each aggravated robbery conviction (counts 24-25) and two years for the reckless endangerment conviction (count 26), with thirty percent of those sentences served in confinement before becoming eligible for release. The court ordered that counts 1, 2, 24, and 25 be served consecutively to each other but concurrently with the remaining sentences for a total effective sentence of 60 years.

On appeal, the appellants contend that the trial court erred in determining the length of the sentences and in imposing consecutive sentencing.

## II. Analysis

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Susan Renee Bise, __ S.W.3d __, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *19 (Tenn. Crim. App. at Knoxville, Sept. 26, 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 2012 WL 4380564, at *11. The burden is on the appellant(s) to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 2012 WL 4380564, at *11; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court

is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

## A. Length of Sentence

The trial court correctly noted that the appellants, as standard Range I offenders, were subject to sentences of not less than fifteen nor more than twenty-five years for the Class A felony convictions of aggravated rape and especially aggravated kidnapping. See Tenn. Code Ann. §§ 39-13-305; 39-13-502; 40-35-112(a)(1). Additionally, the appellants were subject to sentences of not less than eight nor more than twelve years for the Class B felony conviction of aggravated robbery and not less than one nor more than two years for the Class E felony conviction of reckless endangerment. See Tenn. Code Ann. §§ 39-13-103; 39-13-402; 40-35-112(a)(2) and (5).

## 1. Appellant Brown

In sentencing Appellant Brown, the trial court found three enhancement factors: (6), that "[t]he personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great"; (7), that the aggravated rapes "involved a victim and w[ere] committed to gratify the [appellants'] desire for pleasure or excitement"; and (16), that Appellant Brown was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. Tenn. Code Ann. § 40-35-114(6), (7), and (16).

Regarding mitigating factors, the trial court applied mitigating factor (6), noting that Appellant Brown was only fifteen years old at the time he committed the instant offenses. Tenn. Code Ann. § 45-35-113(6). The court also applied mitigating factor (9), that Appellant Brown "assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses" by implicating Appellant Holt "in case number 2010-A-557." Tenn. Code Ann. § 45-35-113(9). The court also found that Appellant Brown pled guilty to the offenses so as to "not force the State and the victims to undergo a lengthy jury trial." Tenn. Code Ann. § 40-35-113(13).

On appeal, Appellant Brown first challenges the application of enhancement factor (6), stating that the "amount of damage to property, presumably the theft in this case, was of

a minor amount" and that the record does not support the trial court's finding that the victims suffered particularly great personal injuries. However, the trial court did not apply enhancement factor (6) because of the physical injuries sustained by the victim. Instead, the court found that both victims had suffered great "psychological or emotional injuries" and had sought psychological treatment.

Our supreme court has stated "that enhancement factor (6) contemplates psychological or emotional injuries, as well as physical injuries, provided that the evidence establishes that such injuries are 'particularly great.'" State v. Arnett, 49 S.W.3d 250, 260 (Tenn. 2001). The court further explained:

> While we recognize that all victims of crime . . . must surely experience mental trauma, we are aware that no two crimes are exactly the same, and no two victims react to [a] crime in the same manner. Because some victims may suffer even more severe emotional trauma than is normally involved with [an] offense, our legislature has seen fit to enhance the punishment for those defendants causing "particularly great" psychological injury.

Id. Therefore, to support the application of this enhancement factor, there must be "specific and objective evidence demonstrating how the victim's mental injury is more serious or more severe than that which normally results from [an] offense. Such proof may be presented by the victim's own testimony, as well as the testimony of witnesses acquainted with the victim." Id.

C.M. testified that she will never be the same as before the offenses, that she "was a shell for a long time," and that she still had trust issues. She said that she had difficulties with her relationships with men, stating that her relationship with Pinson ended as a result of the crimes. She also felt compelled to leave the State and move to the New England area. Pinson testified that he had lost his optimistic outlook, becoming fearful and anxious. He said that he constantly relived the incident in his mind, that he saw a therapist, and that he became "hypervigilant" and could not work. We conclude that there was a sufficient basis for the trial court to apply this enhancement factor to the convictions. See id. at 260-61; see also State v. Williams, 920 S.W.2d 247, 259-60 (Tenn. Crim. App. 1995). Moreover, serious bodily injury is not an element of the offense of reckless endangerment, and the appellants were charged with especially aggravated kidnapping and aggravated robbery accomplished with a deadly weapon, not by causing serious bodily injury; therefore, the trial court was not precluded from applying enhancement factor (6) to those convictions. See Tenn. Code Ann. §§ 39-13-305(a)(1) and (4), 39-13-402(a); see also Tenn. Code Ann. § 40-35-114 (providing

-11-

that an enhancement factor may be applied "[i]f appropriate for the offense and if not already an essential element of the offense").

Appellant Brown next contends that the trial court erred by applying enhancement factor (7) because there was no proof that "the rape[s were] sexually motivated and done to gratify [Appellant Brown's] desire for pleasure or excitement." Tenn. Code Ann. § 40-35-114(7). Our supreme court has explained that when deciding whether enhancement factor (7) applies to sexual crimes, the trial court must look to the "*motive* for committing the offense." Arnett, 49 S.W.3d at 261 (emphasis in original). The court cautioned that "evidence of ejaculation, by itself, does not prove that the rapist's motive was to gratify a desire for pleasure. Accordingly, proper application of factor (7) requires the State to provide additional objective evidence of the defendant's motivation to seek pleasure or excitement through sexual assault." Id. at 262 (citing State v. Kissinger, 922 S.W.2d 482, 490 (Tenn. 1996)). To this end, the court explained that "factor (7) may be applied with evidence including, but not limited to, sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the defendant's enjoyment" of the crime. Id. At the sentencing hearing, C.M. testified that the appellants undressed her, made her get into different positions, and penetrated her in a multitude of ways, including with a cold, foreign object. During the rapes, the appellants "asked [C.M.] to call them daddy and to tell them that [she] liked it." We conclude that the trial court did not err by applying this enhancement factor to the aggravated rape convictions.

In sum, we conclude that the trial court did not err in the application of enhancement and mitigating factors, and we discern no error in the lengths of Appellant Brown's sentences as imposed by the trial court.

## 2. Appellant Holt

In sentencing Appellant Holt, the trial court applied five enhancement factors: (6), that "[t]he personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great"; (7), that the aggravated rapes "involved a victim and w[ere] committed to gratify the [appellants'] desire for pleasure or excitement"; (8) that Appellant Holt "before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; (13)(c) that Appellant Holt committed the instant offenses while on probation; and (16), that Appellant Holt was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. Tenn. Code Ann. § 40-35-114(6), (7), (8), (13)(c) and (16). In mitigation, the court found that Appellant Holt "assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the

offenses," noting that Appellant Holt implicated Appellant Brown in another offense. See Tenn. Code Ann. § 45-35-113(9). The court also found that Appellant Holt pled guilty to the offenses so as to "not force the State and the victims to undergo a lengthy jury trial." Tenn. Code Ann. § 40-35-113(13).

On appeal, Appellant Holt contends that the trial court erred in determining the length of his sentences, specifically arguing that the trial court erred by failing to give proper consideration and weight to two mitigating factors. However, Appellant Holt does not dispute any of the enhancement factors applied by the trial court.

As we stated earlier, the trial court's application of enhancement factors (6), that "[t]he personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great," and (7), that the aggravated rapes "involved a victim and w[ere] committed to gratify the [appellants'] desire for pleasure or excitement," was justified. See Tenn. Code Ann. § 40-35-114(6) and (7). Moreover, because the record reflects that Appellant Holt had juvenile adjudications for two counts of assault with bodily injury, one count of aggravated assault, and one count of burglary, the trial court correctly applied enhancement factor (16). See Tenn. Code Ann. § 40-35-114(16).

Further, as the trial court noted, Appellant Holt's presentence report reflects that Appellant Holt "has two (2) probation violations in his juvenile criminal record." See Tenn. Code Ann. § 40-35-114(8). The violation of prior juvenile court probationary terms can be used to enhance a sentence. See State v. Jackson, 60 S.W.3d 738, 743 (Tenn. 2001). Further, the court found that Appellant Holt was on probation for robbery and burglary of a motor vehicle when he committed the instant offenses. See Tenn. Code Ann. § 40-35-114(13)(c). Therefore, the trial court was justified in applying these enhancement factors.

Appellant Holt argues that the trial court erred by failing to consider mitigating factor (6), that because of youth or old age, he lacked substantial judgment in committing the offense, contending that he was twenty years old at the time of the offense and possessed only a ninth grade education. Ordinarily, "[i]n determining whether this factor is to be applied, courts should consider the concept of youth in context, i.e., the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." State v. Adams, 864 S.W.2d 31, 34 (Tenn. 1993). The trial court considered and rejected this mitigating factor, stating that it might have been "more inclined to consider this factor if these were the only offenses [Appellant Holt] had committed[;] however, [Appellant Holt's] juvenile history reveals [Appellant Holt's] numerous opportunities at rehabilitation and reflects [Appellant Holt's] ability to understand the wrongfulness of his conduct." We discern no error in the trial court's ruling.

Appellant Holt acknowledges that the trial court applied two mitigating factors but argues that the trial court should have weighed them more heavily. However, the weighing of mitigating and enhancement factors is in the trial court's discretion, and this court is bound by the trial court's sentencing decisions as long as sentence is imposed in a manner consistent with the purposes and principles of the Sentencing Act. Carter, 254 S.W.3d at 345-46. Because the trial court's imposition of sentence is consistent with the purposes and principles of the Sentencing Act, the sentence is presumptively correct, and we cannot reweigh the enhancing and mitigating factors. See Carter, 254 S.W.3d at 344-45.

In sum, we conclude that the trial court did not err in applying enhancement and mitigating factors, and we discern no error in the lengths of the sentences imposed by the trial court.

## B. Consecutive Sentencing

Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria in Tennessee Code Annotated section 40-35-115(b).

## 1. Appellant Brown

In determining whether consecutive sentencing was appropriate for Appellant Brown, the trial court found that Appellant Brown had an extensive record of criminal activity and that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(2) and (6). Based on this finding, the trial court ordered that Appellant Brown's sentences for count 1 (twenty years for aggravated rape), count 2 (twenty years for aggravated rape), count 24 (ten years for aggravated robbery), and count 25 (ten years for aggravated robbery) be served consecutively to each other but concurrently with the remaining sentences for a total effective sentence of 60 years. On appeal, Appellant Brown contends that the trial court erred by finding that he has an extensive criminal record and that he was a dangerous offender.

The court based its finding that Appellant Brown had an extensive record of criminal activity upon his previous adjudication for aggravated burglary and the numerous convictions involved in the instant case. Tenn. Code Ann. § 40-35-115(b)(2). This court has stated that

the instant offenses may be used to establish that an offender has an extensive criminal history for the purposes of consecutive sentencing. See State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992) (concluding that a defendant with no prior criminal history but who pled guilty to eight offenses had an extensive criminal history that justified the imposition of consecutive sentencing); see also State v. Carolyn J. Nobles, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. at Nashville, Mar. 7, 2007). Therefore, the trial court did not err in finding that Appellant Brown had an extensive record of criminal activity.

The court also found that Appellant Brown was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4). Our case law clearly reflects that in order to impose consecutive sentencing based upon a finding that a defendant is a dangerous offender, a court must also find (1) "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant" and (2) "that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." Wilkerson, 905 S.W.2d at 938; see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999); State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996).

Regarding its finding that Appellant Brown was a dangerous offender, the trial court explained that the appellants "forcefully enter[ed] the sanctity of [the] victim[s'] homes and robb[ed] them at gunpoint. . . . [I]n addition to robbing both victims, [the appellants] taunted Mr. Pinson and repeatedly raped [C.M.] at gunpoint, forcing her to perform multiple degrading sexual acts and threatened to shoot her if she failed to obey." The court also explicitly found the existence of the Wilkerson factors. We conclude that the trial court did not err in imposing consecutive sentencing on this basis. See Tenn. Code Ann. § 40-35-115(4).

## 2. Appellant Holt

When examining whether consecutive sentencing was appropriate for Appellant Holt, the trial court found that Appellant Holt had an extensive record of criminal activity, that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high, and that Appellant Holt committed the instant offenses while on probation. Tenn. Code Ann. § 40-35-115(b)(2), (4), and (6). The trial court ordered that Appellant Holt's sentences for counts 1 (twenty-three years for aggravated rape), 2 (twenty-three years for aggravated rape), 21 (twenty-three years for especially aggravated kidnapping), and 24 (ten years for aggravated robbery) be served consecutively to each other but concurrently with the remaining sentences for a total effective sentence of 79 years.

On appeal, Appellant Holt summarily contends that the trial court erred "by ordering consecutive sentencing." However, he does not support this contention with any argument. Therefore, he has waived this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see also Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on.").

Nevertheless, we conclude that the trial court did not err in imposing consecutive sentencing. The trial court stated that Appellant Holt had previous adult convictions for robbery and burglary of a motor vehicle, as well as juvenile adjudications for two counts of assault with bodily injury, three counts of disorderly conduct, one count of aggravated assault, two probation violations, and one count of burglary. A defendant's history of juvenile adjudications is an appropriate consideration in determining whether a defendant has an extensive record of criminal activity for consecutive sentencing purposes. See State v. Gann, 251 S.W.3d 446, 465 (Tenn. Crim. App. 2007); State v. Mickens, 123 S.W.3d 355, 396 (Tenn. Crim. App. 2003). Further, the trial court made sufficient findings to determine that the appellant was a dangerous offender. Additionally, Appellant Holt was on probation when he committed the instant offenses. Therefore, we conclude that the trial court did not err by imposing consecutive sentencing upon Appellant Holt. See Tenn. Code Ann. § 40-35-115(b)(2) and (6).

C. Judgments of Conviction

Finally, the State asks this court to remand this case to the trial court for entry of corrected judgments for the aggravated rape convictions to reflect that each appellant is a multiple rapist, not a violent offender. We note that both a violent offender and a multiple rapist must serve one hundred percent of a sentence imposed in confinement. However, a violent offender may earn good time credits and reduce the sentence up to fifteen percent, but a multiple rapist is not eligible for credits to reduce the sentence. See Tenn. Code Ann. §§ 40-35-501(i), 39-13-523(a)(3), (b) and (c); see also Davis v. State, 313 S.W.3d 751, 758 (Tenn. 2010). Therefore, the case must be remanded to the trial court for correction of the judgments for aggravated rape to reflect that the appellants are multiple rapists.

### III. Conclusion

In sum, we conclude that the trial court did not err in sentencing the appellants. However, we must remand for entry of corrected judgments of conviction for the aggravated rape convictions. We affirm the judgments of the trial court in all other respects.

_____
NORMA McGEE OGLE, JUDGE