IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 19, 2017

**STATE OF TENNESSEE v. COMER THOMAS VANCE**

**Appeal from the Circuit Court for Bedford County**
**No. 18192     F. Lee Russell, Judge**

_____

**No. M2017-00204-CCA-R3-CD**

_____

The defendant, Comer Thomas Vance, appeals his Bedford County Circuit Court jury conviction of felony theft, claiming that the evidence was insufficient to support his conviction and that the prosecutor's closing argument was improper. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

James Ronald Tucker, Jr. (on appeal and at trial) and Brian Belden (at trial), Assistant District Public Defenders, for the appellant, Comer Thomas Vance.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael D. Randles and Richard A. Cawley, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In January 2016, the Bedford County Grand Jury charged the defendant with one count of theft of property valued at $1,000 or more but less than $10,000. The trial court conducted a jury trial in November 2016.

The State's proof at trial showed that in June 2015, the victim, Scotty Colwell, was a full-time student at Middle Tennessee State University and worked part-time for a construction company while living in Smithville. The victim owned a 2004 black Mazda 3 hatchback ("the Mazda") that he estimated to be worth between $4,500 and $5,000 in June 2015.

At approximately 6:00 a.m. on June 22, 2015, the victim's foreman picked the victim up from his residence to drive him to work. Before leaving, the victim retrieved his tool belt from the Mazda, which was parked in his driveway, and he inadvertently left his car keys on the seat of the unlocked Mazda. About two hours later, the victim's girlfriend called him at work to inquire about the location of the Mazda because it was no longer parked in the victim's driveway.

The victim's supervisor drove him to the police station so that he could file a report of the theft. The victim provided Detective Matthew Holmes with a full description of the Mazda, including the vehicle identification number ("VIN"). The victim also informed Detective Holmes that the Mazda contained a global positioning system ("GPS") as well as the victim's daughter's baseball equipment.

Sometime later, a law enforcement officer contacted the victim to inform him that the Mazda had been located. The baseball equipment was recovered but the GPS was never recovered. The driver's side door had a large scratch, and the vehicle "was completely full of cigarette[] butts." The victim testified that he had never met or heard of the defendant and that he never gave him permission to take the Mazda.

On June 23, 2015, Shelbyville Police Department Patrolman Bobby Peacock received a call about a suspicious vehicle parked behind a local church. When Patrolman Peacock arrived at the scene, he discovered a black Mazda, but when he checked the Mazda's license plate, he learned that the plate was registered to a Nissan Quest minivan that was owned by the family of Erica Gasbar, who resided across the street from the church. Upon running a search for the Mazda's VIN, Patrolman Peacock learned that the vehicle had recently been reported as stolen.

Patrolman Peacock spoke with Ms. Gasbar, who informed him that the Nissan's license plate had recently been stolen and that she had seen a white male at the house next door driving a black vehicle. Ms. Gasbar identified the defendant as the man she had seen driving the black vehicle, explaining that she had seen him on approximately five prior occasions with Brandy Boyce, who resided next door. Ms. Gasbar testified that shortly after seeing the defendant driving the black vehicle, she noticed that the license plate was missing from the family's Nissan.

Brandy Boyce, the Gasbars' next-door neighbor, testified that she and the defendant had been involved romantically but that the two had ended their relationship in May 2015. While the two were dating, Ms. Boyce would drive to Smithville to visit the defendant because he did not have a car. In June 2015, the defendant "showed up" at Ms. Boyce's residence driving a black Mazda. When Ms. Boyce asked the defendant whose

car he was driving, the defendant responded that he had borrowed it from a friend. The defendant then gave Ms. Boyce a "little girl's bat bag" and baseball bat; he told her that "a friend" had given the items to him, and the defendant wanted Ms. Boyce's daughter to have them. Later that evening, the defendant and Ms. Boyce drove the Mazda to the grocery store, and when they returned, the defendant parked the Mazda "[b]ehind the church across the street."

The following morning, June 23, Ms. Boyce was awakened by detectives knocking on her door. Shelbyville Police Department Detective Brian Crews asked Ms. Boyce if anyone else was present in the residence, and she informed him that the defendant was inside. Detective Crews asked to speak with the defendant and asked Ms. Boyce to locate the keys to the black Mazda. Ms. Boyce was unable to find the keys on the kitchen counter where she had placed them the previous night. After the detectives spoke with the defendant outside, the detectives located the car keys behind an artificial tree in the corner of Ms. Boyce's bedroom. Ms. Boyce also showed Detective Crews the pink baseball bag and bat that the defendant had given her; Detective Crews noticed that the victim's last name was on both the bag and the bat.

Ms. Boyce testified that the defendant was a "[p]retty heavy" smoker, estimating that the defendant smoked a "[p]ack or more" per day. Ms. Boyce denied taking the Mazda from Smithville or ever seeing the Mazda before the defendant arrived at her residence.

With this evidence, the State rested. Following a *Momon* colloquy, the defendant elected not to testify and presented no proof.

Based on this evidence, the jury convicted the defendant as charged of theft of property valued at $1,000 or more but less than $10,000. Following a sentencing hearing, the trial court sentenced the defendant as a career offender to a term of 12 years' incarceration, to be served consecutively to the defendant's sentence in Warren County under docket number F14157 and "any other sentence." Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the evidence adduced at trial was insufficient to support his conviction and that the prosecutor's closing argument was improper. We will address each issue in turn.

*I. Sufficiency*

The defendant first contends that the evidence adduced at trial was insufficient to support his conviction. We disagree.

- 3 -

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103.

Here, the proof adduced at trial established that, on the morning of June 22, 2015, the victim inadvertently left his car keys on the seat of his unlocked black Mazda, which was parked in the driveway of his Smithville residence. That afternoon, the victim learned that his vehicle, which contained his daughter's baseball bag and bat, had been stolen from his driveway. Meanwhile, the defendant, who resided in Smithville and did not own a vehicle, arrived at Ms. Boyce's residence unannounced driving a black Mazda. The defendant informed Ms. Boyce that he had borrowed the vehicle from a friend, and the defendant also gave Ms. Boyce a pink baseball bag and bat to give to her daughter. When Ms. Boyce and the defendant returned from a trip to the grocery store that evening, the defendant parked the Mazda in the church parking lot behind Ms. Boyce's residence. Ms. Boyce recalled placing the car keys on her kitchen counter.

On the morning of June 23, Patrolman Peacock, while investigating a report of a suspicious black Mazda in a church parking lot, learned that the Mazda's plates were registered to a Nissan owned by the Gasbar family and that the Mazda had recently been reported as stolen. Upon speaking with Ms. Gasbar, who lived across the street from the church and next door to Ms. Boyce, Patrolman Peacock learned that the Gasbars'

- 4 -

Nissan's license plate had recently been stolen as well and that Ms. Gasbar had seen the defendant driving the Mazda.

Armed with this information, Detective Crews paid a visit to Ms. Boyce and spoke with the defendant. Ms. Boyce provided Detective Crews with the pink baseball bag and bat, which were both emblazoned with the victim's last name, but she was unable to locate the car keys on her kitchen counter. After speaking with the defendant, Detective Crews found the Mazda's car keys behind a plant in Ms. Boyce's bedroom.

Ms. Boyce denied stealing the Mazda or ever having seen it prior to June 22, and the victim testified that he did not know the defendant and never gave him permission to take the Mazda. Ms. Boyce also testified that the defendant was a "[p]retty heavy smoker," and the victim testified that, when the Mazda was returned to him, it "was completely full of cigarette[] butts." The victim testified that the Mazda was worth between $4,500 and $5,000 in June 2015.

Taking all of this into consideration, we conclude that the defendant intended to deprive the victim of the Mazda by knowingly obtaining it without the victim's consent. Although the defendant argues on appeal that the evidence showed that Ms. Boyce was, in fact, the guilty party, such matters of witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not reweigh such evidence. *See Dorantes*, 331 S.W.3d at 379.

Viewing this evidence in the light most favorable to the prosecution, we find that the evidence adduced at trial overwhelmingly established the defendant's conviction of theft of property valued at $1,000 or more but less than $10,000.

## II. *Prosecutorial Misconduct*

The defendant also asserts that the prosecutor committed misconduct during rebuttal argument by improperly commenting on the defendant's having informed Detective Crews of the location of the Mazda's car keys. In addition, the defendant asserts, with minimal supporting argument, that the trial court erred by denying a mistrial on the basis of the prosecutor's comments. We disagree.

During the State's direct examination of Ms. Boyce, the following exchange occurred regarding the whereabouts of the Mazda's keys:

> Q: Did you tell Detective Crews where the car keys were when you had seen them?

A:     I was, I told him the last time I had seen them, they were laid on the kitchen counter, where I had layed [sic] them after we had came back from the grocery store.

Q:     All right. And were they there at this point in time?

A:     No, sir.

Q:     Were you able to, did you help Detective Crews search for the keys?

A:     I did. I did. I helped him, and there was another officer, it was him, Chuck Merlo, and another officer that was helping look through the house for the keys.

Q:     Were you guys able to find the keys?

A:     Once [the defendant] got a cigarette, he informed them they were in the bedroom.

Q:     All right. What do you mean, once he got a cigarette?

A:     He kept asking for a cigarette and he told them once he got a cigarette, he would tell them where the keys were at.

Q:     All right. So, he told Detective Crews, Hey, if you give me a cigarette, I'll tell you where the keys are?

A:     Basically, that was my understanding. I was in the house the whole time. They had [the defendant] outside talking to him.

Q:     All right. Do you know where the keys were eventually found?

A:     Yes, they were in a[n] artificial, like tree in the corner of the bedroom.

At no point during this testimony did the defendant register an objection.

- 6 -

During Detective Crews' direct examination, the State asked the detective to tell the jury "about the conversation you initially had with the defendant, out on the . . . back deck." Defense counsel objected and requested a bench conference. Outside the presence of the jury, defense counsel explained that the State had failed to disclose during the discovery process the audio recording of the conversation between the detective and the defendant. The trial court sustained the objection and instructed the prosecutor to refrain from discussing the details of the conversation that took place. The trial court did, however, permit the State to elicit testimony from Detective Crews that he was able to locate the car keys following a conversation with the defendant.

When direct examination resumed, the following exchange took place, without objection, between the prosecutor and Detective Crews:

Q: Okay. And I don't want to discuss the substance of that conversation, but as a result of that conversation, were you able to learn where the keys were in the house?

A: Yes.

Q: Okay. And that was the conversation with [the defendant]?

A: Correct.

Q: All right. Now, so, then, after having that conversation with [the defendant], did you go back in the house?

A: I did.

Q: And did you go to a specific location in the house?

A: I did.

Q: And, and did you go to that specific location as a result of the conversation with [the defendant]?

A: I did.

Q: And, and where was that specific location?

A: In the master bedroom. In the corner of the bedroom, there was an artificial tree in the corner of the master bedroom. And behind that artificial tree, I located the keys to the vehicle.

Defense counsel conducted no cross examination of Detective Crews.

During the defendant's closing argument, defense counsel argued that the "State wants you to take the leap that just because, after talking with [the defendant], they, the officers were able to locate the keys inside of Ms. Boyce's house . . . [t]hat [the defendant] is the person that had access, had the keys, hid the keys and even stole the vehicle." Defense counsel then proposed the theory that Ms. Boyce had actually stolen the Mazda. In rebuttal argument, the prosecutor stated as follows:

[Detectives t]alk to Ms. Boyce about it. Yeah, he's driving that black car. And yeah, he's here. And oh, yeah, by the way, the keys are on the counter. But when, after talking to [the defendant], after getting him outside and going to find those keys, they can't find them. Ms. Boyce even helps them try to locate them. They can't find them with Ms. Boyce's help. So, they go outside and have a conversation with [the defendant]. After that conversation, voilà. We know where the keys are now. We go in, we find them exactly where [the defendant] said they would be located.

So, who has possession of that car? I mean, what good's a car without the keys? So, if you've got the keys to that car, you've got that car. . . .

The defendant did not object to these statements, but at the conclusion of the prosecutor's rebuttal argument, defense counsel requested a bench conference and moved for a mistrial on the basis that the prosecutor's statements regarding the defendant's statement about the location of the keys were in violation of the trial court's prior ruling to refrain from mentioning the substance of the conversation. The trial court denied the motion, and defense counsel did not ask for a curative instruction.

The defendant failed to lodge a contemporaneous objection to the remarks he now challenges on appeal. Thus, to be entitled to relief, he must establish not only that the remarks were improper but also that they rose to the level of plain error. *State v. Gann*, 251 S.W.3d 446, 458 (Tenn. Crim. App. 2007) (holding that defendant's failure to lodge a contemporaneous objection during challenged closing argument waived plenary

review of the issue and left only plain error review). We see no basis for noticing the error despite waiver. *See* Tenn. R. App. P. 36(b). Even assuming that the argument was improper, in light of the overwhelming evidence of the defendant's guilt, as previously addressed, it would be harmless. Thus, nothing suggests that "'a substantial right of the accused [was] adversely affected'" or that "'consideration of the error is "necessary to do substantial justice."'" *See State v. Smith*, 24 S.W.3d 274, 282, 283 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

To the extent the defendant argues that the trial court erred by denying his motion for a mistrial, his failure to support this assertion with appropriate argument renders it waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). In any event, we find no abuse of discretion in the trial court's decision to deny the motion for mistrial. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). Here, nothing indicated a manifest necessity for the declaration of a mistrial, and the trial court's decision to deny the motion did not result in a miscarriage of justice. *See Saylor*, 117 S.W.3d at 250.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE