IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2019

## STATE OF TENNESSEE v. RAYMON MUHAMMAD

**Appeal from the Criminal Court for Shelby County**
**No. 17-01313     J. Robert Carter, Jr., Judge**

---

### No. W2018-02141-CCA-R3-CD

---

The defendant, Raymon Muhammad, appeals his Shelby County Criminal Court jury conviction of first degree murder, challenging the sufficiency of the convicting evidence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Tony N. Brayton (on appeal); and Robert Felkner and Brent Walker (at trial), Assistant District Public Defenders, for the appellant, Raymon Muhammad.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Austin Scofield and Carla Taylor, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Shelby County Grand Jury charged the defendant with first degree premeditated murder for the December 23, 2015 death of the victim, John Jones.

At the October 2018 trial, Louise Benson testified that on December 23, 2015, she lived at 1586 McMillan in Memphis. The victim, whom she knew only as "Fish," had come over to visit. Ms. Benson recalled that she "was inside picking some chitlins" when she "heard some shooting." She said that she dropped to the floor while the shooting, which "lasted a good while," continued. When the shooting stopped, she crawled to the front door and saw the victim lying on the front porch; he had been shot. A neighbor telephoned the police.

Memphis Police Department ("MPD") Officer Jonathan McHugh responded to a call of shots fired at 1586 McMillan on December 23, 2015. When he arrived, he observed "a black male face down on the porch. . . . He had no pulse. He wasn't breathing." Officer McHugh believed the victim to be dead.

Crime scene investigators found the home riddled with bullet holes. They located a single 7.62x39 shell casing on the sidewalk outside.

MPD Detective Julius Beasley was the lead investigator into the victim's death. In March 2016, Detective Beasley "received information that [the defendant] would be a critical source to talk to," so he went to interview the defendant, who was incarcerated in Memphis at that time. In his first statement, the defendant "said that Derrick Matthews had gotten into a fight with" the victim about a week before the victim's death and that Mr. Matthews "knew that he had to get [the victim] before [the victim] got him." The defendant said that Mr. Matthews picked him up in Mr. Matthews' white Chevrolet Cobalt, that he rode in the backseat, and that Mr. Matthews fired shots at the victim as he was driving. The defendant told Detective Beasley that he saw the victim fall just before Mr. Matthews drove away.

Detective Beasley said that the defendant's claim that he had been a backseat passenger in the car while Mr. Matthews shot the victim "didn't sound right," so he elected to interview the defendant a second time. In his second statement, the defendant "admitted that he was the shooter and that he shot because Mr. Matthews told him to and that he received $1000 plus a cell phone in order to do it." Detective Beasley recalled that the defendant "became emotional" and started crying during his second statement. The defendant described the circumstances surrounding the offense:

> A couple of days after the fight at the club, he told me he got to get Fish before Fish get him. I told him, "you gotta do what you gotta do." A week later, he told me to go pick up a steamer behind Hamilton High School and I picked up the Chevrolet Cobalt. I went to Silver street to pick up Derrick Matthews. He got in the car with an AK47 and told me to get in the passenger seat. He was the driver and he gave me the gun when I got in the passenger seat. Derrick told me he was going to drive to McMillan and when I see Fish start shooting. He drove to McMillan and I saw Fish sitting on the porch. Derrick told me to start shooting as we were driving by the house. I put the gun out the passenger side window and started shooting at Fish. I saw Fish fall on the porch and we drove off. As we made it back to Silver street, he took the

gun, got out of the car and told me to take the car to some apartments and park it. I drove the car to some apartments on South Parkway and Barksdale. When I got there, I parked the car and walked back down South Parkway to the corner store at Parkway and Wilett. Derrick and his female friend, Quita, pulled up on me at the store in a gray Chrysler 200, 4 door, and he told me to give him the keys to the Chevrolet Cobalt. I gave him the keys and [he] told me to keep my mouth closed and don't say nothing about what happened. I walked away and hung out at the corner store and he drove off. The next day he met me at Unc's house and gave me $500. A week later he gave me $500 more.

The defendant identified both Mr. Matthews and the victim from a photographic array.

During cross-examination, Detective Beasley testified that during the course of the investigation, he had learned that the defendant and the victim had had a confrontation over a woman at a strip club.

MPD Detective Jesse Browning, testified that Detective Beasley told him that the car used in the victim's murder had been dumped in an apartment complex at South Parkway and Barksdale. Detective Browning then searched the MPD database and learned that a vehicle matching the description provided by the defendant had been reported stolen on December 18 and recovered on December 31, 2015, at an apartment complex at South Parkway and Barksdale. He also learned that 13 shell casings of the type discovered at the murder scene had been discovered inside the car. He relayed this information to Detective Beasley, who then asked him to review telephone records for the defendant and Mr. Matthews.

During his review of the telephone records, Detective Browning discovered that Mr. Matthews "had communicated with" telephone number 470-262-2658 and that that number had been activated on the day of the murder. Detective Browning "ran that number in Facebook," and "it came back to a Facebook profile with that profile name of Rambo Gutta." The photograph accompanying the profile was of the defendant.

Joann Jackson testified that at approximately 5:20 a.m. on December 17, 2015, she exited her home in Memphis to find that her white two-door Chevrolet Cobalt was missing from the driveway. She telephoned the police and reported the theft. Later, she was contacted by a representative from the MPD, who informed her that her car was located on South Parkway. She went and picked the car up the same day.

-3-

MPD Sergeant Carolyn Bryant testified that she responded to a call of an abandoned car at the Lapoloma Apartments on December 31, 2015. Sergeant Bryant ran a check of the license tag and learned that the car had been reported stolen. Sergeant Bryant noticed shell casings inside the car. She collected the shell casings. Sergeant Bryant later telephoned Ms. Jackson to let her know that the car had been located, and Ms. Jackson picked it up that same day.

Tennessee Bureau of Investigation Special Agent and Forensic Scientist Kasia Lynch testified as an expert in firearms identification. Agent Lynch compared the 13 shell casings found inside the car to the single shell casing found at the scene and concluded "that all of those cartridge cases had been fired by the same gun."

Doctor Marco Ross, Interim Chief Medical Examiner at the West Tennessee Regional Forensic Center, testified that he had reviewed the report of the autopsy of the victim performed by Doctor Karen Chancellor. The cause of the victim's death "was a gunshot wound of the left arm going into his chest." He "had a single gunshot wound with an entrance wound on the left arm, the bullet subsequently penetrated the left lung, also the thoracic spine, as well as a pulmonary artery . . . and then went through the right lung and exited out his back."

Following Doctor Ross's testimony, the State rested. The defendant chose not to testify and did not present any proof.

Based upon this evidence, the jury convicted the defendant as charged, and the trial court imposed a sentence of life imprisonment. The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

In this appeal, the defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to establish that he acted with premeditation. The State submits that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither

-4-

re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202 (2006). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

The evidence adduced at trial established that Mr. Matthews quarreled with the victim. At the behest of Mr. Matthews, the defendant stole a car and picked Mr. Matthews up. Mr. Matthews got into the driver's seat, gave the defendant an AK-47, and told him to start shooting as soon as he saw the victim. The defendant did as Mr. Matthews asked. One of the bullets struck the victim, and he fell to the floor of the

porch.  Mr. Matthews and the defendant drove away.  The defendant dumped the stolen car at a nearby apartment complex, and Mr. Matthews paid the defendant $1,000 for killing the victim.  The defendant's preparations before the killing and calmness afterwards, in addition to the remuneration provided to him by Mr. Matthews, all support a finding that he premeditated the victim's murder.  Although he claims on appeal that he acted under duress because he was afraid of Mr. Matthews, no evidence supported such a claim.

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE